**Lansing, Michigan**

# Opinion

Chief Justice:
Marilyn Kelly

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

FILED JULY 31, 2010

STATE OF MICHIGAN

SUPREME COURT

RAYMOND O'NEAL,

Plaintiff-Appellant,

v                                                        No. 138180

ST. JOHN HOSPITAL & MEDICAL
CENTER, RALPH DiLISIO M.D. and
EFSTATHIOS TAPAZOGLOU, M.D.,

Defendant-Appellees.

BEFORE THE ENTIRE BENCH

HATHAWAY, J.

This case addresses the burden of proof necessary to establish proximate causation

in a traditional medical malpractice action. At issue is whether the Court of Appeals

properly reversed the trial court's denial of summary disposition. The trial court ruled

that plaintiff had established a question of fact on the issue of proximate causation

sufficient to withstand a motion for summary disposition. The Court of Appeals

reversed. It treated plaintiff's claim as a loss-of-opportunity claim instead of a traditional

medical malpractice claim and held that plaintiff did not raise a genuine issue of fact, as

required by *Fulton v William Beaumont Hosp,* 253 Mich App 70; 655 NW2d 569 (2002), because plaintiff could not prove that receiving the alleged appropriate treatment would have decreased his risk of stroke by greater than 50 percentage points. We disagree with the Court of Appeals' analysis and conclusion.

We hold that the Court of Appeals erred by relying on *Fulton* and determining that this is a loss-of-opportunity case controlled by both the first and second sentences of MCL 600.2912a(2), and instead hold that this case presents a claim for traditional medical malpractice controlled only by the first sentence of § 2912a(2). Further, we conclude that plaintiff established a question of fact on the issue of proximate causation because plaintiff's experts opined that defendants' negligence more probably than not was the proximate cause of plaintiff's injuries. Finally, we hold that *Fulton* did not correctly set forth the burden of proof necessary to establish proximate causation for traditional medical malpractice cases as set forth in § 2912a(2). Therefore, we overrule *Fulton* to the extent that it has led courts to improperly designate what should be traditional medical malpractice claims as loss-of-opportunity claims and has improperly transformed the burden of proof in a traditional malpractice case from *a* proximate cause to *the* proximate cause.

Accordingly, we reverse the judgment of the Court of Appeals and remand this matter to the Court of Appeals for consideration of the issue not decided on appeal in that court.

2

## I. FACTS AND PROCEEDINGS

This case involves allegations of negligence in medical care. Plaintiff had an illness known as sickle cell anemia. Plaintiff developed acute chest syndrome (ACS), which is a known complication of sickle cell anemia. Plaintiff claims that his ACS was misdiagnosed as pneumonia and as a consequence he did not receive the correct treatment. Plaintiff's experts opined that ACS requires treatment with an aggressive blood transfusion or an exchange transfusion, either of which needs to be given on a timely basis. While plaintiff ultimately received a transfusion, his experts opined that it was given too late and as a consequence, plaintiff suffered a disabling stroke. Plaintiff alleged that defendants' failure to provide a timely transfusion violated the standard of care and that defendants' negligence was a proximate cause of his disabling stroke. Plaintiff's complaint pled a traditional malpractice claim and did not plead a claim for lost opportunity.

In support of his position, plaintiff offered two expert hematologists who testified that defendants' violations of the standard of care more probably than not caused plaintiff's injuries. Plaintiff's third hematology expert explained his opinion in statistical terms and testified that a patient with ACS has a 10 to 20 percent chance of developing a stroke. He further testified that with a timely exchange transfusion, the risk of stroke is reduced to less than 5 to 10 percent.

Defendants brought a motion for summary disposition challenging the sufficiency of plaintiff's expert testimony on the issue of proximate causation. Even though plaintiff's complaint pled only traditional malpractice, defendants' motion made no

3

distinction between the proof required for proximate causation in a traditional malpractice claim and the burden required for a claim based on loss of opportunity. Instead, defendants argued that plaintiff's case was controlled by both the first and second sentences of MCL 600.2912a(2), which requires that the plaintiff prove "that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants" and that "the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%."

Defendants argued that a reduction in the risk of stroke from 10 to 20 percent to less than 5 to 10 percent amounted to at best a 20 *percentage point differential*,[1] which would be insufficient to meet the burden of proof on proximate causation. Defendants relied on *Fulton* to support their position that plaintiff must comply with this *percentage point differential* theory. Plaintiff countered that defendants' statistical portrayal of these numbers was mathematically inaccurate because his experts' testimony supported a finding that his injuries were more probably than not proximately caused by defendants' negligence. The trial court agreed with plaintiff. The trial court denied defendants'

---

[1] The Court of Appeals reasoned: "This number is the difference between the highest chance plaintiff had of developing a stroke without proper treatment (i.e., 20 percent) and the lowest chance of developing a stroke with proper treatment (i.e., less than five percent, or in the light most favorable to plaintiff, zero percent)". *O'Neal v St John Hosp & Med Ctr*, unpublished opinion per curiam of the Court of Appeals, issued November 4, 2008 (Docket Nos. 277317 and 277318), p 5 n 7.

4

motion, ruling that plaintiff had presented sufficient testimony to establish a question of fact on proximate causation.

The Court of Appeals based its decision entirely on *Fulton* and reversed the trial court in an unpublished opinion per curiam, holding that this case presented a claim for a loss of opportunity and that plaintiff had not met his burden of proof under MCL 600.2912a(2).[2] The Court of Appeals reasoned that plaintiff was bound by the *Fulton* analysis and that a percentage point differential applied to this case.[3] The Court opined:

> In asserting that defendants' negligence resulted in a stroke, plaintiff essentially argues that had defendants ordered a transfusion sooner, plaintiff would have avoided a stroke. Thus, to say defendants' failure to apply proper treatment caused the stroke is to say that this failure deprived plaintiff a greater opportunity to avoid the stroke. Consequently, plaintiff's claim amounts to one of lost opportunity to achieve a better result, and § 2912a(2) is applicable.

> In *Fulton*, this Court set forth the formula by which to calculate whether the opportunity to achieve a better result was greater than 50 percent – specifically, the Court must "subtract[] the plaintiff's opportunity to survive after the defendant's alleged malpractice from the initial opportunity to survive without the malpractice." *Ensink* [*v Mecosta Co Gen Hosp*, 262 Mich App 518, 531; 687 NW2d 143 (2004)], *supra* at 531.[4]

We granted leave to review this matter, asking the parties to brief:

> (1) whether the requirements set forth in the second sentence of MCL 600.2912a(2) apply in this case; (2) if not, whether the plaintiff presented sufficient evidence to create a genuine issue of fact with regard to whether the defendants' conduct proximately caused his injury or (3) if so, whether *Fulton v William Beaumont Hosp*, 253 Mich App 70 (2002), was

---

[2] *Id*. at 4.

[3] *Id*. at 4-5.

[4] *Id.* at 4.

5

correctly decided, or whether a different approach is required to correctly implement the second sentence of § 2912a(2).[5]

## II.  STANDARD OF REVIEW

This case involves review of a trial court's decision on a motion for summary disposition which this Court reviews de novo.[6]  The issue also involves questions of statutory interpretation.  Statutory interpretation is a question of law, which this Court also reviews de novo.[7]

## III.  ANALYSIS

At issue is whether the Court of Appeals properly reversed the trial court's denial of summary disposition on the issue of proximate causation.  In order to answer this question we must review MCL 600.2912a.

MCL 600.2912a provides:

(1) Subject to subsection (2), in an action alleging malpractice, the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:

(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice or care in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

---

[5] *O'Neal v St John Hosp & Med Ctr*, 485 Mich 901 (2009).

[6] *Herald Co v Bay City,* 463 Mich 111, 117; 614 NW2d 873 (2000).

[7] *In re Investigation of March 1999 Riots in East Lansing)*, 463 Mich 378, 383; 617 NW2d 310 (2000).

(b) The defendant, if a specialist, failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

(2) In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.

This statute, which governs the burden of proof in medical malpractice cases, was originally added to the Revised Judicature Act in 1977. It has been amended on several occasions, with the most recent amendment in 1993 adding subsection (2), which is at issue in this case. Subsection (2) contains two sentences. It is undisputed that the first sentence, which repeats the burden of proof as articulated in subsections (1)(a) and (b), merely reiterates the longstanding rule requiring a plaintiff to prove "that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants." MCL 600.2912a(2).

The second sentence of § 2912a(2) addresses a subcategory of injuries in medical malpractice litigation governed by the loss-of-opportunity doctrine. The Legislature did not define the phrase "loss of an opportunity to survive or an opportunity to achieve a better result." However, while not defined in the statute, the doctrine was initially

7

recognized and defined in Michigan in *Falcon v Mem Hosp*, 436 Mich 443; 462 NW2d 44 (1990).[8]

It is generally accepted that the 1993 amendment to § 2912a was adopted in a direct reaction to *Falcon*, meaning that it repudiated *Falcon*'s reduced proximate causation theory.[9] Thus, it is generally accepted that in adopting this amendment, the Legislature intended to limit medical malpractice claims to the pre-*Falcon* state of the law: if it was more probable than not that the plaintiff would have died even with the best of treatment, a claim for medical malpractice is precluded.[10]

We next turn to the correct interpretation of both sentences of § 2912a(2) and their applicability to the case before us. In examining the first line of § 2912a(2), we are guided by the principle that *nothing* in § 2912a(2) has changed the burden of proof for traditional medical malpractice claims. The language of the first line of subsection (2) is clear: "*in an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by*

---

[8] *Falcon* held that in a wrongful death case a plaintiff could bring a claim for a decedent's loss of opportunity to survive even if he or she did not meet the traditional proximate causation standard. *Falcon* reasoned that when the decedent suffered a substantial reduction in the loss of opportunity to survive—in that case 37.5 percent—even though the plaintiff could not maintain a traditional malpractice claim for the death itself because the plaintiff could not establish causation, she could bring a claim for loss of opportunity to survive. *Falcon* also stated that the doctrine applied to wrongful death claims and left the question of whether the doctrine applied to lesser injuries to another day. 436 Mich at 460-462, 469-470 (opinion by LEVIN, J.).

[9] *Stone v Willaimson*, 482 Mich 144, 169; 753 NW2d 106 (2008).

[10] Nothing in our opinion today alters or changes that premise.

*the negligence of the defendant or defendants.*" This language reiterates the language of the previous subsections and merely restates the well-accepted, well-established historical rule for proximate causation.[11] As the meaning of this sentence is well-established, no further statutory construction is necessary.

The proper interpretation of proximate causation in a negligence action is well-settled in Michigan. In order to be a proximate cause, the negligent conduct must have been a cause of the plaintiff's injury and the plaintiff's injury must have been a natural and probable result of the negligent conduct. These two prongs are respectively described as "cause-in-fact" and "legal causation." See *Skinner v Square D Co,* 445 Mich 153, 162-163; 516 NW2d 475 (1994); *Sutter v Biggs*, 377 Mich 80; 139 NW2d 684 (1966); *Glinski v Szylling*, 358 Mich 182; 99 NW2d 637 (1959). While legal causation relates to the foreseeability of the consequences of the defendant's conduct, the cause-in-fact prong "generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *Skinner*, 455 Mich at 163. It is equally well-settled that proximate causation in a malpractice claim is treated no differently than in an ordinary negligence claim, and it is well-established that there can be more than one proximate cause contributing to an injury. *Brisboy v Fibreboard Corp*, 429 Mich 540; 418 NW2d 650 (1988); *Barringer v Arnold*, 358 Mich 594; 101 NW2d 365 (1960); *Gleason v Hanafin*, 308 Mich 31; 13 NW2d 196 (1944). Finally, it is well-established

---

[11] *Kirby v Larson*, 400 Mich 585, 600-607; 256 NW2d 400 (1977)(opinion by WILLIAMS, J.).

that the proper standard for proximate causation in a negligence action is that the negligence must be "a proximate cause" not "the proximate cause." *Kirby v Larson*, 400 Mich 585; 256 NW2d 400 (1977). Thus, the burden of proof for proximate causation in traditional medical malpractice cases is analyzed according to its historical common law definitions and the analysis is the same as in any other ordinary negligence claim. Nothing in this opinion changes or alters these well-settled principles.[12]

We next consider whether the Court of Appeals erred by relying on *Fulton* and applying the second sentence of § 2912a(2) to the present case. The second sentence of § 2912a(2) provides "In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%." Since the statute was amended in 1993, litigants and the courts have debated the meaning of this second sentence.[13] While the

---

[12] This is true despite the contrary statements in Justice YOUNG's dissent. The comments of the dissent amount to nothing more than another intemperate outburst of inappropriate accusations and illogical assertions. While the dissent decries confusion, the only apparent confusion in this matter lies in the dissent itself, which lacks sound analytical reasoning and even a basic understanding of the law of proximate causation. The dissent, if followed to its logical conclusion, would allow recourse for the negligent actions of medical providers only in those instances in which one provider's conduct is at issue and only when no pre-existing medical condition exists. Such an interpretation is not supported by any case law or the statute itself.

[13] The opinions in *Stone* illustrate this point. The debate has centered on such questions as whether the Legislature intended this sentence to restore the law to its pre-*Falcon* state, meaning that loss-of-opportunity claims are not recognized at all, or whether the Legislature's choice of language reflected intent to recognize such claims but limit their availability. Questions have also arisen about whether the last sentence of § 2912a(2) applies to *all* medical malpractice cases, including traditional ones, or only those that are presented as loss-of-opportunity claims.

10

debate over the meaning of the second sentence demonstrates that significant questions surround loss-of-opportunity cases, it is clear from the plain language of the statute that the second sentence is intended to apply to loss-of-opportunity cases. Today we address whether the second sentence of § 2912a(2) also applies to traditional malpractice cases and we unequivocally hold that it does not. Because the Court of Appeals in this case relied on *Fulton,* which erroneously applied the second sentence to a traditional malpractice case, we review *Fulton* and determine what, if any, continuing validity it has.

*Fulton* involved a claim for the failure to timely diagnose cervical cancer. The plaintiff, the personal representative of the decedent's estate, alleged that if decedent's cancer had been diagnosed during her pregnancy, she would have had treatment options available that could have saved her life. The theory was that the decedent was not diagnosed until her cancer was untreatable and, as a consequence, she died. The plaintiff's expert's testimony on proximate causation was described by the Court of Appeals as follows:

> Defendants moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiff could not show that their negligence was the cause of Fulton's death. In response, plaintiff submitted an affidavit from Dr. Taylor, opining that if Fulton's cancer had been diagnosed while she was pregnant and if she had been treated after her child was delivered, she would have had an eighty-five percent chance to survive. Dr. Taylor opined that when Fulton was actually diagnosed with cancer, her opportunity to survive had decreased to sixty to sixty-five percent. Therefore, according to Dr. Taylor, Fulton's opportunity to survive the cancer decreased by twenty to twenty-five percent because of defendants' malpractice. In reply, defendants argued that Dr. Taylor's affidavit was improper because it contradicted his deposition testimony and that, in any

11

event, this affidavit was not enough to create a question of fact under MCL 600.2912a(2).[14]

*Fulton* opined that because the decedent went from an 85 percent pre-malpractice chance of survival to a 60-65 percent post-malpractice chance of survival, she "suffered a loss of a twenty to twenty-five percent chance of survival."[15] Fulton determined that a *percentage point differential subtraction* analysis was required by the statute. As demonstrated by the *Fulton* analysis, the conclusion is reached by a simplistic subtraction formula. *Fulton* subtracted the statistical likelihood of a better outcome without treatment from the statistical likelihood of a better outcome with treatment to determine if the resulting number is greater than 50.

*Fulton*'s simplistic subtraction formula is not an accurate way to determine whether a defendant's malpractice is a proximate cause of the injury. *Fulton*'s analysis was erroneous because it misconstrued proximate causation as it applies to a traditional malpractice case. Under the *Fulton* subtraction formula it is mathematically impossible for there to be more than one proximate cause. Thus, in creating and applying this simplistic formula, *Fulton* fundamentally altered plaintiff's burden of proof. *Fulton* transformed the burden of proof in traditional malpractice cases from *a* proximate cause to *the* proximate cause because it allows for only one proximate cause in any case. This proposition is in error because it has no basis in statute or common law and it is inconsistent with the clear and unambiguous language of the first sentence of § 2912a(2).

___

[14] *Fulton,* 253 Mich App at 74-75.

[15] *Id.* at 82.

Moreover, as the Court of Appeals' decision in this case illustrates, *Fulton*'s analysis is being applied to all malpractice cases, even when they are pled only as traditional malpractice cases.

The Court of Appeals analysis in the present case perpetuates the *Fulton* doctrine and the confusion surrounding proximate causation in medical malpractice claims. Much of the confusion stems from the inherent nature of medical malpractice: the plaintiff is generally seeking treatment for a preexisting medical condition that is causing a problem of some sort on its own, whereas in an ordinary negligence claim the plaintiff is generally an otherwise uninjured person who is claiming that the entire injury was caused by the incident.

In the present case, plaintiff was prepared to offer three expert witnesses to testify on his behalf on the issue of proximate causation at the time of trial. Two of plaintiff's experts unequivocally opined, in a discovery deposition, that had the necessary treatment been given, it was more probable than not that plaintiff would not have had a stroke.

Plaintiff's first expert, Dr. Richard Stein, opined:

> *Q*. I just have one question. Doctor, based on the extrapolation of the peds data that you've described for us, within a reasonable degree of medical certainty, and by that I mean with a greater than 50 percent likelihood, if Dr Tapazoglou had met the standard of care as you defined it today, would the stroke have been avoided?
>
> *A*. To a reasonable degree of medical certainty, my opinion is yes, and I have already stated the basis for that opinion.

After opining that an exchange transfusion was necessary to reduce plaintiff's hemoglobin S concentration to less than 30 percent, Dr. Luce, plaintiff's second expert, opined:

> *Q.* With respect to Mr. O'Neal, if the hemoglobin S had been reduced to less than 30 percent, do you have an opinion as to whether or not he would have had the stroke anyhow?
>
> *A.* I think it is probable that he would not have.
>
> *Q.* When you say "probable," are you prepared to say more probably than not had Mr. O'Neal had his hemoglobin S reduced to less than 30 percent he would not have had a stroke?
>
> *A.* Correct.

The testimony of the third expert, Dr. Griffin Rodgers, was more specific in expressing the statistics. The trial court summarized his testimony:

> Dr. Griffin Rodgers, a hematologist, testified that a patient in sickle cell crisis of acute chest syndrome has in the order of 10 or 20 percent chance of developing a stroke. With a timely exchange transfusion, it reduces the risk of stroke to less than 5 or 10 percent. Dr. Griffin's testimony demonstrates that Plaintiff had more than a 50 percent chance to avoid a stroke.

As this case demonstrates, the way causation is analyzed is important, especially when reviewing statistical data. In this instance, do these facts represent at best a 20 percent chance to avoid an injury, as the Court of Appeals concluded, or do they establish proximate causation as found by the trial court? To answer this question we must determine whether we use a *percentage point differential subtraction analysis* (as used by the Court of Appeals in applying the *Fulton* formula) or whether we follow the approach taken by the trial court. In doing so we must follow the analysis that is most consistent with our historical rules governing proximate causation and the plain language of

§ 2912a(2), which requires that a plaintiff prove *that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants*, in the context of this case. While the use of mathematical statistics is not required by the statute, and we do not impose such a requirement, we conclude that the analysis used by plaintiff's experts and the trial court represents the correct approach *in this instance* because it accurately represents the historical view of proximate causation as expressed in the first sentence of § 2912a(2) *based on its application to these facts*.

In this case, it is undisputed that with or without treatment plaintiff was more probably than not going to avoid the stroke. In other words, even without treatment it was more probable that plaintiff would *not* have a stroke. However, plaintiff did have a stroke. If the *Fulton* 50 percentage point differential subtraction analysis is used, plaintiff cannot proceed with a traditional claim because the failure to provide treatment was not the cause of the injury expressed in percentage point differential terms. As previously indicated, however, the problem is that a 50 percentage point differential subtraction analysis necessarily means that there can only be *one cause of an injury*. This analysis is not consistent with the historical test for proximate causation, which has always been that the malpractice be *a* proximate cause rather than *the* proximate cause.

Applying a 50 percentage point differential subtraction analysis requires that we change the traditional analysis of causation in medical malpractice cases to the *one* most immediate, efficient, and direct cause of the injury. This, however, is the standard for

15

determining *the* proximate cause rather than *a* proximate cause. This approach is simply not in keeping with our historical view of causation.[16]

The *Fulton* approach is incorrect because it requires a reliance on probabilities and possibilities of things that have not yet occurred, rather than reliance on what has actually occurred. Plaintiff in this case *did* have a stroke and was injured; his claim is for an existing injury, not just the possibility of one. Plaintiff's injury is no longer a statistical probability, it is a reality. The focus, once he was injured, is on the connection between defendants' conduct and the injury. The relevant inquiry for proximate causation is whether the negligent conduct was a cause of plaintiff's injury and whether plaintiff's injury was a natural and probable result of the negligent conduct. If so, defendants' conduct was *a* proximate cause, even though there may have been other causes. The analysis for proximate causation is the same whether we are discussing medical malpractice or ordinary negligence. Defendants' conduct in this case meets this standard when the defendants' actual conduct, rather than plaintiff's statistical probability of achieving a better outcome, is the focus of the inquiry.

---

[16] Common-law rules apply to medical malpractice actions unless specifically abrogated by statute. See MCL 600.2912(1) which provides:

> A civil action for malpractice may be maintained against any person professing or holding himself out to be a member of a state licensed profession. *The rules of the common law applicable to actions against members of a state licensed profession, for malpractice, are applicable against any person who holds himself out to be a member of a state licensed profession.* [Emphasis added.]

16

In this instance, plaintiff suffered an injury that was more probably than not proximately caused by the negligence of defendants. As the trial court properly found, defendants' negligent conduct increased plaintiff's risk of stroke from less than 5 to 10 percent to 10 to 20 percent. When viewed in the light most favorable to plaintiff, the change is from less than 5 percent to 20 percent. As the trial court analyzed, this represents a change that is greater than 50 percent in this instance. The trial court's approach is in keeping with the historical analysis of proximate causation because it involves a comparative analysis, not a simplistic subtraction formula. Determining what is "more probable than not" is inherently a comparative analysis. The proper method of determining whether defendant's conduct more probably than not proximately caused the injury involves a comparative analysis, which is dependent upon the facts and circumstances and expert opinion in a given case.[17]

We conclude that *Fulton*'s simple subtraction analysis is wrong and unsupportable. While § 2912a(2) does not mandate the use of statistics or require any particular mathematical formula, the historic analysis of proximate cause must be followed to wit: the analysis or formulation used cannot require that the cause must be *the* proximate cause rather than *a* proximate cause.

No single formula can be dispositive for all cases. In this case if we were to use a standard percentage decrease calculation (meaning that defendants were responsible for

---

[17] Comparative analyses could include standard percentage increases, standard percentage decreases, or other scientifically accepted statistical analyses offered by the experts.

17

15 percentage points out of the 20 total percentage points of plaintiff's risk of the bad result, so that there is a 15/20 chance or 75 percent chance) defendant's malpractice was a proximate cause of the injury.[18]   Similarly, if the evidence is viewed as a standard percentage increase calculation (meaning that defendant was responsible for 15 percentage points of increase over the 5 percentage points to begin with, thus causing a 300% (15/5) increase in plaintiff's risk of harm,) defendant's malpractice was a proximate cause of the injury.[19]

It is also important to emphasize that not all traditional medical malpractice cases can or will be expressed in statistical or percentage terms, nor is a plaintiff required to express proximate causation in percentage terms.  The plain language of the statute requires that proximate causation in traditional malpractice cases be expressed by showing that the defendant's conduct was *more probably than not* a cause of the injury, not by statistical or percentage terms.[20]

---

[18] Moreover, either of the mathematical formulas used as an example (standard statistical decrease or increase) may not be appropriate in all cases because either could limit causation to one proximate cause in those cases involving the conduct of more than one defendant.

[19] I recognize that Justice CAVANAGH and I differ on whether an increased risk of harm is a valid statistical method for determining proximate causation in a traditional malpractice case.  However, both Justice CAVANAGH and I agree that claims evaluated in that manner may be brought; we only disagree about whether those claims proceed as claims for traditional malpractice or claims for loss-of-opportunity.

[20] We also recognize that different mathematical formulations can have varying results and that the results must be viewed in the light most favorable to the nonmoving party.  For example, while percentage increases and percentage decreases would both be valid methods to determine proximate causation, they can yield different results.  In those

Given that *Fulton* used an incorrect mathematical formula and is being used to transform the burden of proof in traditional malpractice cases, we must next decide if it has any continuing validity. We find that it has none in the context of traditional medical malpractice cases. In *Stone*, all *seven* justices of this Court recognized that *Fulton*'s analysis was incorrect or should be found to no longer be good law, though their reasons for doing so varied.[21] While I was not a member of this Court when *Stone* was decided, I also conclude that *Fulton* did not correctly set forth the burden of proof necessary to establish proximate causation as set forth in § 2912a(2). As all justices of this Court have concluded that *Fulton*'s analysis of § 2912a(2) is wrong, it is illogical to fail to overrule *Fulton*, because by failing to do so, this Court fosters unnecessary confusion for litigants and the lower courts. Accordingly, we overrule *Fulton* to the extent that it has led courts to improperly designate what should be traditional medical malpractice claims as loss-of-opportunity claims and has improperly transformed the burden of proof in a traditional malpractice case from *a* proximate cause to *the* proximate cause.

We emphasize that we hold that the second sentence of § 2912a(2) applies only to medical malpractice cases that plead loss of opportunity and not to those that plead traditional medical malpractice; we do not address the scope, extent, or nature of loss-of-opportunity claims as that issue is not before us. Significant questions surround such

instances, if either calculation demonstrates that the plaintiff suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants, the plaintiff's case may proceed.

[21] *Stone*, 482 Mich at 164 (opinion by TAYLOR, C.J.).

19

claims.[22]  However, we decline to decide issues that are not necessary to the resolution of the case before us.

## IV. CONCLUSION

For all the foregoing reasons, we conclude that the Court of Appeals erred in the present case by reversing the trial court's denial of summary disposition.  The case before us presents a traditional malpractice claim.  It does not present a claim for loss of opportunity.  In traditional malpractice cases, the plaintiff is required to prove that the defendant's negligence more probably than not caused the plaintiff's injury.  In this case, the testimony of plaintiff's expert witnesses supports plaintiff's position on proximate causation.  While that testimony is not dispositive, it is sufficient to raise a question of fact to defeat a motion for summary disposition, allowing the issue to be adjudicated on the merits by the trier of fact.  Finally, we overrule *Fulton* to the extent that it has led courts to improperly designate what should be traditional medical malpractice claims as loss-of-opportunity claims and has improperly transformed the burden of proof in a traditional malpractice case from *a* proximate cause to *the* proximate cause.

---

[22] Questions exist about the full scope and extent of loss-of-opportunity claims and the extent of damages recoverable in those actions, which we do not decide today.  For example, a partial discussion of the scope of loss-of-opportunity claims was at issue in *Wickens v Oakwood Healthcare Sys*, 465 Mich 53; 631 NW2d 686 (2001).  While Justice CAVANAGH and I do not fully agree in this case, I do agree with Justice CAVANAGH's partial dissent in *Wickens* that a living person may pursue a claim for loss of opportunity under the circumstances presented in that case.

20

Accordingly, we reverse the judgment of the Court of Appeals and remand this matter to the Court of Appeals for consideration of the issue not decided on appeal in that court.

WEAVER, J., concurred with HATHAWAY, J.

STATE OF MICHIGAN

SUPREME COURT

RAYMOND O'NEAL,

      Plaintiff-Appellant,

v                                         No. 138180, 138181

ST. JOHN HOSPITAL & MEDICAL
CENTER, RALPH DiLISIO, M.D., and
EFSTATHIOS TAPAZOGLOU, M.D.,

      Defendant-Appellees.

_____

CAVANAGH, J. (*concurring*).

I concur in the result. I agree with the majority that the Court of Appeals'

judgment in this case should be reversed because the Court erred by treating this case as a

loss-of-opportunity case instead of a traditional medical malpractice case and, as a result,

erred by requiring plaintiff to meet the requirements in the second sentence of MCL

600.2912a(2). I further agree that *Fulton v William Beaumont Hosp*, 253 Mich App 70;

655 NW2d 569 (2002), should be overruled to the extent that courts have relied on it to

improperly transform what could be traditional medical malpractice claims into loss-of-

opportunity claims.[1] I write separately to express my views on the issues presented.

_____

[1] Contrary to Justice YOUNG's assertion, I overrule *Fulton* only to the extent that it is implicated in this case. Regardless, I am sincerely baffled about what relevance Chief Justice KELLY's views on a former composition of *this* Court have to do with whether we should overrule a *Court of Appeals* case.

This case raises the issue of what the proper burden of proof for proximate causation is in medical malpractice cases in which the plaintiff had a preexisting risk of the bad result that occurred, even absent the defendant's alleged negligence. I agree with the lead opinion that the second sentence of MCL 600.2912a(2) is inapplicable to this case because it only applies to loss-of-opportunity claims and this case does not involve a loss-of-opportunity claim. Instead, the key issue in this case is the proper interpretation of the first sentence of MCL 600.2912a(2).

The first sentence of MCL 600.2912a(2) clearly provides that a plaintiff in any medical malpractice case, including a traditional medical malpractice case, bears the burden of showing that it is more probable than not that the plaintiff's injury was proximately caused by the defendant's negligence. Under traditional malpractice law in Michigan, proximate cause includes two prongs: (1) cause in fact and (2) legal, or "proximate," cause.[2] See, e.g., *Skinner v Square D Co*, 445 Mich 153, 162-163; 516 NW2d 475 (1994). While legal causation relates to the foreseeability of the consequences of the defendant's conduct, the cause-in-fact prong "generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *Id.* at 163. The cause-in-fact prong is sometimes also stated as requiring that "it is more likely than not that the conduct of the defendant was a cause in fact of the result." *Weymers v Khera*, 454 Mich 639, 648; 563 NW2d 647 (1997) (quotation marks

---

[2] Because the statute incorporates words and phrases from the common law, it is appropriate to consider common-law meanings of these phrases. See *People v Wright*, 432 Mich 84, 92; 437 NW2d 603 (1989).

2

and citations omitted). Thus, even in cases in which there is statistical evidence that the plaintiff had a risk of the bad result occurring absent negligence,[3] a plaintiff may still meet the cause-in-fact prong of the proximate causation analysis if the plaintiff can show that it is more probable than not that the defendant's alleged negligence was a cause in fact of the bad result occurring. I would hold that this threshold is met if the plaintiff can show that the alleged negligence was responsible for a majority, or "more than fifty percent," of the risk of the bad result occurring. See MCL 600.2912a(2) and *Falcon v Mem Hosp*, 436 Mich 443, 450; 462 NW2d 44 (1990).[4]

Under this approach, a court should consider the total risk of the bad result that the plaintiff faced, including the risk caused by the alleged negligence. Then, the court should consider how much of that risk was created by the negligence. If the negligence was responsible for more than half of the total risk of the bad result and the plaintiff suffered that bad result, then the cause-in-fact prong of the proximate cause analysis is met because it is more probable than not that the defendant's negligence was a cause in

---

[3] I agree with the lead opinion, however, that not all traditional medical malpractice cases need to be expressed in statistical or percentage terms in order to meet the "more probable than not" standard.

[4] If a plaintiff cannot meet the burden for a traditional medical malpractice claim, I would hold that the plaintiff may still pursue a loss-of-opportunity claim if the plaintiff can meet the requirements for those claims provided in MCL 600.2912a(2) and *Falcon*, as explained in my opinion in *Stone v Williamson*, 482 Mich 144, 170-179; 753 NW2d 106 (2008).

fact of the bad result.[5]  This approach is consistent with the statutory language "more probable than not" and with the historical approach to proximate causation.[6]

---

[5] To give a nonmedical example, if I am rolling a die, there is ordinarily a 1 out of 6 chance that I will roll a number one.  But if a defendant negligently changes two additional sides of the die to number ones, then the die will have three number ones.  Now my chances of rolling a number one are 3 out of 6 (or 1/2).  If I actually roll a number one, there is a 2/3 (approximately 67 percent) chance that I rolled a number one that was created by the defendant's negligence.  Therefore, there is a more than 50 percent chance that I rolled a number one because of the defendant's negligence, i.e., it is more probable than not that the defendant's negligence was a cause in fact of the result.  Notably, this analysis will differ somewhat if the plaintiff's increased risk of the bad result is alleged to have been caused by multiple negligent actors, depending on the timing and the interaction of the various causes.

[6] Justice YOUNG haphazardly concludes that "the majority" is extending the exception to the cause-in-fact prong created in *Falcon* to all medical malpractice claims.  I agree that *Falcon* created what was essentially an exception to this rule, but I fail to see, and Justice YOUNG utterly fails to explain, how my approach in this case is an extension of that rule to all traditional medical malpractice cases.  Justice YOUNG himself explains that "[i]n cases in which the plaintiff alleges that the defendant's negligence more probably than not caused the injury, the claim is one of simple medical malpractice [as opposed to loss-of-opportunity]."  (Quotation marks and citation omitted.)

Setting aside the numerous pages of Justice YOUNG's opinion that consist only of irrelevant, hyperbolic, or unsubstantiated commentary, he appears to raise only two substantive concerns with my approach, and neither provides support for his conclusion that it does not satisfy the cause-in-fact prong.  First, he irrelevantly notes that, as I concede in footnote 7, this approach is inconsistent with an example I used in *Stone*.  Second, he alleges that I should not have compared the *low* end of the possible range of plaintiff's risk of the bad result absent negligence to the *high* end of the range of plaintiff's risk with negligence.  I think that my approach is perfectly consistent with our charge to view the evidence in the light most favorable to the plaintiff, given that even Justice YOUNG explains that the experts testified that plaintiff's risk was somewhere *between* the ranges the experts provided.  But regardless, this criticism only challenges which numbers to use and not the merits of the approach itself, and it would be possible, as Justice YOUNG prefers, to instead compare the low ends of the ranges, or the high ends, only to each other.  For example, if the alleged negligence increased a plaintiff's risk of the bad result from 5 to 10 percent to 30 to 40 percent, then, regardless of which numbers are compared, the negligence would have been responsible for a majority of the

In adopting this approach, I reject the view that a plaintiff must show that the defendant's negligence increased the plaintiff's risk by more than 50 *percentage points*, e.g., from 25 percent to 76 percent, or from 10 percent to 61 percent.[7] As noted by the lead opinion, this approach is inconsistent with the historical approach to proximate causation. It is also inconsistent with the first sentence in MCL 600.2912a(2) because it would preclude traditional medical malpractice claims in many cases in which the defendant's negligence was more probably than not a cause in fact of the bad result, such as in a case in which the negligence increased the risk of a bad result from 5 percent to 45 percent.[8] I also reject the lead opinion's "percent-increase" test because it is similarly inconsistent with a more-probable-than-not standard. The fact that a negligent act caused

---

plaintiff's risk of the bad result, and, given that the bad result occurred, it would be more probable than not that the negligence was a cause in fact of the bad result occurring. Justice YOUNG fails to address why this logic is incorrect or levy a criticism that actually supports his conclusion that my approach eviscerates the cause-in-fact requirement.

[7] To the extent that I endorsed the percentage point approach by way of an example in my opinion in *Stone*, I repudiate that position. See *Stone*, 482 Mich at 177 (opinion by CAVANAGH, J.), stating that a plaintiff whose chance of survival decreased from 80 to 40 percent could not bring a traditional malpractice claim because it would not amount to a 50 percent change.

[8] In this example, the defendant was responsible for 40 percentage points of the plaintiff's risk, out of a total of 45 percentage points, meaning that there is a 40 out of 45 chance, or 40/45 (approximately 89 percent) chance, that the defendant's negligence was a cause in fact of the bad outcome. In contrast, under the percentage-point approach, the plaintiff's burden would not have been met because the increase in risk was 40 percentage *points*.

a 50 percent increase in the risk of a bad result does not demonstrate that it is more probable than not that the negligence was a cause in fact of the bad result.[9]

In this case, plaintiff presented sufficient facts to establish the cause-in-fact prong of the proximate cause analysis in a traditional medical malpractice claim. Viewing the facts in the light most favorable to plaintiff, plaintiff's expert testified that defendants' alleged negligence increased plaintiff's risk of the bad result, the stroke, from 5 percent to 20 percent. Defendant was thus responsible for 15 percentage points out of the total 20 percentage points of plaintiff's risk of the bad result, meaning that there is a 15/20 chance, or 75 percent chance, that defendant's alleged negligence was a cause in fact of the bad result.[10] Thus, plaintiff has presented evidence sufficient to support his allegation

---

[9] For example, if a defendant's negligence caused an increase in a plaintiff's risk of a bad result from 10 percent to 15 percent, this would be a 50 percent increase in risk. But it is not more probable than not that the defendant's negligence was a cause in fact because the defendant would only have been responsible for five out of the total 15 percentage points of the plaintiff's risk of the bad result, meaning that there is only a 5/15 chance, or an approximately 33 percent chance, that the negligence was a cause in fact of the bad result. As I explain in footnote 3, however, the plaintiff could still pursue a loss-of-opportunity claim.

[10] Although this formulation is mathematically identical to Justice MARKMAN's approach, there are very important differences in how we view its utility. I favor adopting it because it is consistent with the more-probable-than-not standard in the *first* sentence of MCL 600.2912a(2) as applied to traditional medical malpractice claims in which the plaintiff had a risk of the bad result even absent negligence. In contrast, Justice MARKMAN believes it is required by the *second* sentence of MCL 600.2912a(2) and, unlike myself, believes that all medical malpractice claims in which there was a risk of the bad result occurring even absent negligence should be treated as loss-of-opportunity claims, regardless of whether the plaintiff can meet the burden of proof for a traditional medical malpractice claim. As explained in my concurring opinion in *Stone*, I continue to think that Justice MARKMAN's interpretation is inconsistent with the statute's text and

6

that it is "more probable than not" that defendant's negligence was a cause in fact of the stroke occurring.

For the foregoing reasons, I concur with the lead opinion that the judgment of the Court of Appeals should be reversed. I would remand the case to the Court of Appeals for further proceedings.

KELLY, C.J., concurred with CAVANAGH, J.

---

Michigan law, including *Falcon*. *Stone,* 482 Mich at 179-184 (opinion by CAVANAGH, J.).

STATE OF MICHIGAN

SUPREME COURT

RAYMOND O'NEAL,

      Plaintiff-Appellant,

v

No. 138180, 138181

ST. JOHN HOSPITAL & MEDICAL
CENTER, RALPH DiLISIO, M.D., and
EFSTATHIOS TAPAZOGLOU, M.D.,

      Defendant-Appellees.

_____

KELLY, C.J. (*concurring*).

     I fully join Justice CAVANAGH's concurring opinion. I write separately because in his dissent (which Justice CORRIGAN joins), Justice YOUNG continues to quote and misleadingly characterize a statement I made nearly two years ago off the bench. *Post* at 1 (YOUNG, J., dissenting). For my response, I refer the reader to my concurring opinion in *Univ of Mich Regents v Titan Ins Co*, ___ Mich ___, ___; ___ NW2d ___ (2010) (KELLY, C.J., concurring).

                                          Marilyn Kelly

STATE OF MICHIGAN

SUPREME COURT

RAYMOND O'NEAL,

      Plaintiff-Appellant,

v                                 No. 138180

ST. JOHN HOSPITAL & MEDICAL
CENTER, RALPH DiLISIO M.D. and
EFSTATHIOS TAPAZOGLOU, M.D.,

      Defendant-Appellees.

_____

WEAVER, J., (*concurring*).

I concur fully with and sign Justice HATHAWAY's opinion. I write separately to note that by overruling the Court of Appeals' decision in *Fulton*, we are not overruling precedent from this Court. Justice YOUNG's dissent, however, attempts to mislead the public into thinking that this Court *is* overruling such precedent by introducing a discussion of stare decisis into this case.

Justice YOUNG'S dissent lists 12 cases that have been overruled by this Court in the past 18 months. While Justice YOUNG may feel aggrieved by this Court overruling those 12 cases, amongst those cases were some of the most egregious examples of judicial activism that did great harm to the people of Michigan. Those decisions were made by the "majority of four," including Justice YOUNG, under the guise of ideologies such as "textualism" and "judicial traditionalism."

As I stated in my concurrence in *Univ of Mich Regents v Titan Ins Co*, ___ Mich ___, ___ ; ___ NW2d ___ (2010), I agree with the sentiment recently expressed by Chief Justice Roberts of the United States Supreme Court in his concurrence to the decision in *Citizens United v Fed Election Comm*, 558 US ___, ___; 130 S Ct 876, 920; 175 L Ed 2d 753, 806 (2010), when he said that

> *stare decisis* is neither an "inexorable command," *Lawrence* v. *Texas*, 539 U. S. 558, 577 [123 S Ct 2472; 156 L Ed 2d 508] (2003), nor "a mechanical formula of adherence to the latest decision," *Helvering* v. *Hallock*, 309 U. S. 106, 119 [60 S Ct 444; 84 L Ed 604] (1940) . . . . If it were, segregation would be legal, minimum wage laws would be unconstitutional, and the Government could wiretap ordinary criminal suspects without first obtaining warrants. See *Plessy* v. *Ferguson*, 163 U. S. 537 [16 S Ct 1138; 41 L Ed 256] (1896), overruled by *Brown* v. *Board of Education*, 347 U. S. 483 [74 S Ct 686; 98 L Ed 873] (1954); *Adkins* v. *Children's Hospital of D. C.*, 261 U. S. 525 [43 S Ct 394; 67 L Ed 785] (1923), overruled by *West Coast Hotel Co* v. *Parrish*, 300 U. S. 379 [57 S Ct 578; 81 L Ed 703] (1937); *Olmstead* v. *United States*, 277 U. S. 438 [48 S Ct 564; 72 L Ed 944] (1928), overruled by *Katz* v. *United States*, 389 U. S. 347 [88 S Ct 507; 19 L Ed 2d 576] (1967).

Chief Justice Roberts further called stare decisis a "principle of policy" and said that it "is not an end in itself." *Id*. at ___; 130 S Ct at 920; 175 L Ed 2d at 807. He explained that "[i]ts greatest purpose is to serve a constitutional ideal—the rule of law. It follows that in the unusual circumstance when fidelity to any particular precedent does more to damage this constitutional ideal than to advance it, we must be more willing to depart from that precedent." *Id* at ___; 130 S Ct at 921; 175 L Ed 2d at 807. It appears that Justice YOUNG does not agree with Chief Justice Roberts.

The consideration of stare decisis and whether to overrule wrongly decided precedent always includes service to the rule of law through an application and exercise of judicial restraint, common sense, and a sense of fairness—justice for all.[1]

Elizabeth A. Weaver

---

[1] Justice YOUNG's apparent contempt for the common law and common sense can be seen in his 2004 article in the Texas Review of Law and Politics, where Justice YOUNG stated:

> Consequently, I want to focus my remarks here on the embarrassment that the common law presents—or ought to present—to a conscientious judicial traditionalist. . . .

> To give a graphic illustration of my feelings on the subject, I tend to think of the common law as a drunken, toothless ancient relative, sprawled prominently and in a state of nature on a settee in the middle of one's genteel garden party. Grandpa's presence is undoubtedly a cause of mortification to the host. But since only the most ill-bred of guests would be coarse enough to comment on Grandpa's presence and condition, all concerned simply try ignore him. [Young, *A judicial traditionalist confronts the common law*, 8 Texas Rev L & Pol 299, 301-302 (2004).]

STATE OF MICHIGAN

SUPREME COURT

RAYMOND O'NEAL,

      Plaintiff-Appellant,

v                                   No. 138180, 138181

ST. JOHN HOSPITAL & MEDICAL
CENTER, RALPH DiLISIO, M.D., and
EFSTATHIOS TAPAZOGLOU, M.D.,

      Defendants-Appellees.

_____

MARKMAN, J. (*concurring in the result only*).

Unlike the majority, I conclude that this is a lost-opportunity case because it is possible that the bad outcome here, i.e., suffering a stroke, would have occurred even if plaintiff had received proper treatment. However, I concur in the result reached by the majority because plaintiff has raised a genuine issue of material fact regarding whether he suffered a greater than 50 percent loss of an opportunity under MCL 600.2912a. Therefore, I agree with the majority that the judgment of the Court of Appeals should be reversed and this case should be remanded to the Court of Appeals for it to consider defendants' remaining issue on appeal, i.e., the admissibility of the expert testimony proffered by plaintiff. However, I strongly disagree with the analysis of the majority and believe that it will lead to confusion and unnecessary litigation.

# I. STATUTE AND CASELAW

MCL 600.2912a(2) provides:

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.[1]

In *Fulton v William Beaumont Hosp,* 253 Mich App 70; 655 NW2d 569 (2002), the Court of Appeals held that a lost-opportunity plaintiff must prove that his loss was greater than 50 percentage points. That is, the difference between the plaintiff's premalpractice chance to achieve a better result and the plaintiff's postmalpractice chance to achieve a better result must be greater than 50 percentage points.[2]

In *Stone v Williamson,* 482 Mich 144; 753 NW2d 106 (2008), although all seven justices concluded that *Fulton* was wrongly decided, this Court could not overrule *Fulton* because, while four justices concluded that *Fulton* was a lost-opportunity case, six justices concluded that *Stone* was not a lost-opportunity case. See *Stone,* 482 Mich at 164 n 14 (opinion by TAYLOR, C.J.) ("[B]ecause a majority of justices hold that this is not a lost-opportunity case, the issue of the correctness of *Fulton,* cannot be reached, and

---

[1] For a discussion of the common law that existed before the enactment of this statutory provision, see my concurring opinion in *Stone v Williamson,* 482 Mich 144; 753 NW2d 106 (2008) (MARKMAN, J., concurring).

[2] As I did in *Stone,* I use the term "premalpractice chance" to refer to the plaintiff's chance to survive or achieve a better result with proper treatment, and the term "postmalpractice chance" to refer to the plaintiff's chance to survive or achieve a better result without proper treatment.

*Fulton*'s approach remains undisturbed as the method of analyzing lost-opportunity cases.").[3]  In *Stone,* Chief Justice TAYLOR and Justices CORRIGAN and YOUNG concluded that the loss-of-an-opportunity provision is "unenforceable."  *Stone,* 482 Mich at 147 (opinion by TAYLOR, C.J.).  They concluded that if the plaintiff's premalpractice opportunity to achieve a better result was greater than 50 percent, the plaintiff could bring a traditional medical-malpractice action.  However, if the plaintiff's premalpractice opportunity to achieve a better result was 50 percent or less, the plaintiff could not bring a traditional medical-malpractice action or a lost-opportunity action because lost-opportunity actions are no longer allowed under the language of the statute.

Justices CAVANAGH, KELLY, and WEAVER concluded in *Stone* that if the percentage point difference between the plaintiff's premalpractice opportunity to achieve a better result and his postmalpractice opportunity to achieve a better result was greater than 50 percentage points, the plaintiff could bring a traditional medical-malpractice action.  However, if the percentage point difference was 50 points or less, the plaintiff could only bring a lost-opportunity action and would have to prove that his premalpractice opportunity to achieve a better result was greater than 50 percent.

---

[3] Because a majority of justices now believes that neither *Fulton* nor the instant case are lost-opportunity cases, *Fulton* is now apparently overruled at least with regard to the determination concerning whether a case is a traditional medical-malpractice action or a lost-opportunity action.  However, because a majority of the justices conclude that the instant case is not a lost-opportunity case, *Fulton*'s method of analyzing lost-opportunity cases is unaffected by the decision in this case.

Finally, in *Stone,* I concluded that a lost-opportunity case is "one in which it is at least possible that the bad outcome would have occurred even if the patient had received proper treatment." *Id.* at 186 (MARKMAN, J., concurring).[4] I further concluded that in order for a lost-opportunity plaintiff to prevail, he must prove that his lost opportunity was greater than 50 percent. And,

> [i]n order to determine whether the "lost opportunity" was greater than 50 percent, the postmalpractice chance of obtaining a better result must be subtracted from the premalpractice chance, the postmalpractice chance must then be subtracted from 100, the former number must be divided by the latter number, and then this quotient must be multiplied by 100 to obtain a percentage. [*Id.*]

"If this percentage is greater than 50, the plaintiff may be able to prevail; if this percentage is 50 or less, then the plaintiff cannot prevail." *Id.*

## II. PROBLEMS WITH *FULTON*

As I observed in *Stone,* the first problem with *Fulton* is that it requires a loss of more than 50 *percentage points,* while MCL 600.2912a(2) requires a loss of more than 50 *percent.*

> The Court of Appeals in *Fulton* . . . concluded that because the plaintiff's premalpractice chance of survival was 85 percent and her postmalpractice chance of survival was 60 percent to 65 percent, her "lost opportunity" was 20 percent to 25 percent and, thus, because the plaintiff's "lost opportunity" was not greater than 50 percent, she could not recover under MCL 600.2912a(2). However, *Fulton* did not offer any explanation as to why it merely subtracted the postmalpractice chance from the premalpractice chance to determine the "lost opportunity." This might have

---

[4] "By contrast, if there is no question that the proper treatment would have resulted in a good outcome, then the patient who has suffered a bad outcome has a traditional medical-malpractice action." *Stone,* 482 Mich at 186 (MARKMAN, J., concurring).

4

been the correct method of determining the "lost opportunity" if MCL 600.2912a(2) required that such a loss be "greater than 50 percentage points." However, MCL 600.2912a(2) requires that the "lost opportunity" be "greater than 50%." There is a significant distinction between 50 percentage points and 50 percent. As Dr. Roy Waddell, a board-certified orthopedic surgeon in Grand Rapids, has explained: "A decrease in survival rate from 50 percent to 10 percent is a 40-*percentage-point* decrease, but it is an 80 *percent* decrease." Waddell, *A doctor's view of "opportunity to survive": Fulton's assumptions and math are wrong,* 86 Mich B J 32, 33 (March 2007) (emphasis in original). Similarly, a reduction in wages from $5 an hour to $1 an hour is not a 4 percent reduction in wages; rather, it is an 80 percent reduction in wages. [*Id.* at 196 (emphasis in the original).]

As I also observed in my concurring opinion in *Stone,* Justice CAVANAGH made this same mistake in his concurring opinion in *Stone*:

> Like the Court of Appeals in *Fulton,* Justice CAVANAGH offers no explanation as to why he repeatedly calculates the "lost opportunity" in terms of the percentage points lost rather than the actual percentage lost when MCL 600.2912a(2) clearly states that the "lost opportunity" must be "greater than 50%," not greater than 50 percentage points. These statistical concepts are utterly distinct. [*Id.* at 196 n 11.]

I am pleased that Justice CAVANAGH and the other justices who signed his opinion in *Stone* (Chief Justice KELLY and Justice WEAVER) now apparently recognize this analytical error, and that they now "repudiate" that position. Thus, a majority of the justices of this Court now agree that MCL 600.2912a(2) requires us to determine whether the lost opportunity is "greater than 50%," not whether the lost opportunity is greater than 50 percentage points.

The other problem with *Fulton,* that Justice CAVANAGH and his colleagues in the majority also now apparently recognize, is that "it does not differentiate between those patients who would have survived regardless of whether they received proper or improper

treatment and those patients who needed the proper treatment in order to survive." *Id.* at 197.[5] As I observed in *Stone*:

> Such a differentiation is necessary because only those in the latter group have truly suffered a "lost opportunity" as a result of the improper treatment. That is, if a patient would have survived regardless of whether he received proper or improper treatment, the improper treatment cannot be said to have caused him to lose an opportunity to survive. On the other hand, if the patient would have survived only if he had received the proper treatment, the improper treatment *can* be said to have caused him to lose an opportunity to survive. MCL 600.2912a(2) requires us to determine whether the patient more likely than not fell into the latter category rather than the former category, because the statute only allows a plaintiff to recover for a "loss of an opportunity" that was "greater than 50%" and that was "caused by the negligence of the defendant . . . ." Dr. Waddell's calculation does just that:

$$\frac{\text{(Premalpractice chance) - (Postmalpractice chance)}}{100\text{-(Postmalpractice chance)}}$$

---

[5] Although the majority describes their formula in considerably different terms than I did in *Stone*, the same result is produced under either formula. That is, regardless of whether the formula is described as I do [(premalpractice chance of better result) - (postmalpractice chance of better result)]/[100 - (postmalpractice chance of better result)], or, as the majority now does [(postmalpractice chance of worse result) - (premalpractice chance of worse result)]/[(postmalpractice chance of worse result)], the same figure is obtained. Given Justice CAVANAGH's forceful criticisms of my formula in *Stone*, it is encouraging that we are now in agreement on this critical point. See, e.g., *Stone,* 482 Mich at 183-184 (CAVANAGH, J., dissenting) ("the Waddell formula [which I adopted in *Stone* and to which I continue to adhere] is blatantly inconsistent with the language of MCL 600.2912a(2)"; "[i]t is inconceivable that Justice MARKMAN can read the [statute] and conclude that it should be translated into this formula"; "[t]he approach taken by Justice MARKMAN and Dr. Waddell requires [the statute] to be rewritten"; "the Waddell approach leads to such anomalous results that it cannot possibly reflect the intention of the Legislature"). While Justice CAVANAGH is correct that he employs the formula to determine whether plaintiff's cause of action is a traditional medical-malpractice action or a lost-opportunity action, and I use it to determine whether plaintiff has satisfied the greater-than-50-percent requirement, we agree nonetheless that the number produced by the formula represents the opportunity that the plaintiff lost as a result of the defendant's negligence.

6

The quotient resulting from this numerator and denominator is then multiplied by 100 to obtain a percentage. This number must be "greater than 50%" in order to satisfy the requirement of the second sentence of MCL 600.2912a(2). For instance, if the patient's premalpractice chance to achieve a better result was 80 percent and, as a result of the defendant's malpractice, the patient's postmalpractice chance is reduced to 20 percent, the patient has suffered a 75 percent loss of an opportunity to survive.[6]

What the Waddell formula essentially does is test the sufficiency of the expert testimony, which is typically presented in the form of two statistics: the likelihood that a patient would have had a good outcome with proper treatment (the "[premalpractice chance]") and the likelihood that a patient would have had a good outcome with negligent treatment (the "[postmalpractice chance]"). The Waddell formula allows a court analyzing this data to determine whether the plaintiff, when the patient has experienced a bad outcome, has created a question of material fact concerning whether proper treatment more likely than not would have made a difference. The formula does this by identifying the universe of patients who would have had a bad outcome (the denominator) and the subset of those patients who could have been favorably treated (the numerator).

It is easiest to start with the formula's denominator. This denominator consists of the universe of all patients who would have had a bad outcome, for whatever reason. This group includes two subsets of patients: those who would have had a bad outcome because they received negligent treatment, and those who would have had a bad outcome despite receiving proper treatment. The formula identifies this group by subtracting from 100 the percentage of patients who would have had a good outcome even without proper treatment; in other words, it subtracts the "[postmalpractice chance]" from 100. In this way, a court can take the expert's statistics and identify those patients who were not treated properly and who experienced a bad outcome. A patient who is the subject of a medical-malpractice action is a member of this group. But we cannot determine whether the patient is a member of this group because he or she was denied the proper treatment or because he or she would have suffered a bad outcome even with proper treatment.

One more calculation must then be made in order to answer the dispositive question posed by the statute: whether it is more likely than not that the patient would have benefited from proper treatment or, put another

---

[6] $[(80 - 20)/(100 - 20)] \times 100 = 75\%$.

7

way, whether the "opportunity to survive or . . . to achieve a better result" was "greater than 50%." MCL 600.2912a(2). A court has to determine what percentage of those patients with a bad outcome (those patients in the denominator) would have benefited from treatment. This brings us to the Waddell formula's numerator. The numerator consists of those patients who would have had a bad outcome only if they had been negligently treated. It is calculated by subtracting the "[postmalpractice chance]" from the "[premalpractice chance]," thus identifying those patients who required treatment to avoid a bad outcome.

Once the numerator and denominator have been calculated, comparison of these two numbers by their quotient allows a court to reasonably determine whether improper treatment more likely than not made a difference in the patient's outcome. If the number of patients who would have had a bad outcome only if they had been negligently treated (the numerator) comprises more than half of the number of patients who would have had a bad outcome overall (the denominator), then the plaintiff has established that proper treatment more likely than not would have made a difference. In other words, when this has been shown, the plaintiff has created a question of material fact concerning whether the "opportunity"-- the benefit that would have been realized by a group of patients from the treatment that was not given to this specific patient-- was greater than 50 percent. Such a plaintiff has presented adequate expert testimony to establish a "lost opportunity" cause of action within the meaning of the statute.

As Dr. Waddell has explained:

"[T]he intent of the law is to disallow damages unless it can be shown that *proper treatment creates a better than even* ("greater than 50%") *chance of survival of the patients who would have died without treatment.* In other words, if appropriate treatment *cannot* save at least half of the patients who otherwise would have died, then you do not have sufficient evidence to show that the negligence made the difference in the adverse outcome (death). Conversely, if good treatment *can* save more than half of the patients who otherwise would have died, then you have adequate evidence that the poor treatment or negligence was likely to blame for the bad outcome. This is exactly what this definition of opportunity measures." [Waddell, 86 Mich B J at 33 (emphasis in original).]

MCL 600.2912a(2) only allows a plaintiff to recover for a "loss of an opportunity" that was "greater than 50%" and that was "caused by the negligence of the defendant . . . ." Use of Dr. Waddell's formula, which generates the actual percentage lost rather than the number of percentage

points lost, and excludes those who would have achieved a good result regardless of the malpractice, best ensures, in my judgment, that these statutory requirements are satisfied. That is, this calculation would impose liability, in accordance with MCL 600.2912a(2), in those instances in which the medical care received more likely than not affected whether the patient survived. [*Id.* at 197-202.]

## III. APPLICATION

In the instant case, plaintiff alleged that defendants failed to timely and properly treat his acute chest syndrome, a serious complication of sickle-cell disease, and that, as a result, he suffered a stroke. More specifically, plaintiff alleged that defendants should have performed an exchange blood transfusion in which the patient's abnormal blood is taken out and replaced with normal blood, rather than a simple blood transfusion in which normal blood is simply added to the patient's abnormal blood.[7] Plaintiff's expert witness testified that there was a 10 to 20 percent chance of stroke without proper treatment, but that with proper treatment there would have been only a 5 to 10 percent chance of stroke. In other words, with proper treatment plaintiff had a 90 to 95 or more percent chance of not suffering a stroke, and without proper treatment he had an 80 to 90 percent chance of not suffering a stroke. That is, plaintiff's premalpractice chance to achieve a better result was, at best, 95 percent, and his postmalpractice chance was, at worst, 80 percent. Pursuant to the Waddell calculation, plaintiff lost a 75 percent opportunity to achieve a better result:

---

[7] An exchange blood transfusion was not performed until *after* plaintiff suffered a stroke. As a result of the stroke, plaintiff suffers from partial paralysis of his left leg and complete loss of function of his left hand and arm.

9

$$\frac{95 - 80}{100 - 80} \times 100 = 75\%$$

Therefore, plaintiff has raised a genuine issue of material fact regarding whether he suffered a greater than 50 percent loss of an opportunity under MCL 600.2912a(2). For these reasons, I agree with the majority that the judgment of the Court of Appeals should be reversed and this case should be remanded to the Court of Appeals for it to consider defendants' remaining issue on appeal, i.e., the admissibility of the expert witness testimony proffered by plaintiff.

## IV. MAJORITY'S ANALYSIS

Although I agree with the majority that the Court of Appeals should be reversed, I strongly disagree with its analysis.

## A. LOST OPPORTUNITY VS. TRADITIONAL MEDICAL MALPRACTICE

### 1. GREATER-THAN-50-PERCENT REQUIREMENT

On the one hand, the majority concludes that whether the plaintiff's lost opportunity is greater than 50 percent determines whether the plaintiff's action is a lost-opportunity action or a traditional medical-malpractice action. I find this conclusion to be completely illogical. Either the defendant's negligence has caused the plaintiff to suffer the injury, or it has caused the plaintiff to suffer a loss of an opportunity to achieve a better result-- the better result being not to suffer the injury. How substantial the plaintiff's lost opportunity is determines whether he satisfies the "greater than 50%" requirement of MCL 600.2912a(2), not whether the plaintiff's action constitutes a lost-opportunity action in the first place. As I stated in *Stone*:

10

In order to satisfy traditional medical-malpractice action requirements, there must be no question that the proper treatment would have resulted in a good outcome (at least with regard to the specific injury suffered by the patient), because if there is any chance that a patient who received proper treatment might nevertheless have suffered the specific bad outcome ultimately suffered by the patient, it cannot be proved that the improper treatment caused the bad outcome. If there is any chance that the proper treatment could have resulted in the bad outcome, the chances of a good outcome with proper treatment and the chances of a good outcome with improper treatment must be compared. That is, under those circumstances, although the plaintiff cannot prove that the defendant's malpractice caused the bad outcome because the bad outcome might have occurred even with proper treatment, the plaintiff may be able to prove that the defendant's malpractice increased the patient's chances of obtaining a bad outcome and, thus, caused him or her to suffer a "lost opportunity" to achieve a better result. This is the only coherent concept of a "lost opportunity" cause of action under MCL 600.2912a(2). [*Stone,* 482 Mich at 271 (MARKMAN, J., concurring).]

Because it is possible that the bad outcome in this case, i.e., suffering a stroke, might have occurred *even if* plaintiff had received proper treatment, the instant case constitutes a lost-opportunity action.

## 2. PLAINTIFF'S PLEADINGS

On the other hand, the lead opinion concludes that "the second sentence of § 2912a(2) applies only to medical malpractice cases that plead loss of opportunity, and not to those that plead traditional medical malpractice . . . ." That is, the lead opinion concludes that whether the plaintiff's action constitutes a lost-opportunity action or a traditional medical-malpractice action is a function of whether the plaintiff has used the magic words "lost opportunity" in his pleading. If he did not, the action is a traditional medical-malpractice action and the plaintiff need not concern himself with satisfying the greater-than-50-percent requirement of MCL 600.2912a(2). However, if the plaintiff *did*

11

use the words "lost opportunity" in his pleading, the action *is* a lost-opportunity action and the plaintiff must satisfy the greater-than-50-percent requirement of MCL 600.2912a(2). Besides being utterly inconsistent with the majority's own conclusion that a lost opportunity greater than 50 percent determines whether the plaintiff's action constitutes a lost-opportunity action or a traditional medical-malpractice action, it is also inconsistent with the well-established principle that Michigan courts are "not bound by a party's choice of label for its action [because this would] put form over substance . . . ." *St. Paul Fire & Marine Ins Co v Littky*, 60 Mich App 375, 378-379; 230 NW2d 440 (1975). Instead, as we explained in *Maiden v Rozwood*, 461 Mich 109, 135; 597 NW2d 817 (1999), "the gravamen of plaintiff's action is determined by considering the *entire* claim." (Emphasis added.)

Thus, just as whether a plaintiff labels an action as an ordinary negligence action does not control whether that action is, in fact, an ordinary negligence action or a medical-malpractice action, see *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411; 684 NW2d 864 (2004), whether a plaintiff labels an action as a traditional medical-malpractice action or a lost-opportunity action cannot control whether the plaintiff's action is, in fact, a traditional medical-malpractice action or a lost-opportunity action. This established principle ensures that the governing *law,* and not the label the parties attach to that law, controls the outcome of an action. As the United States Supreme Court has observed, any other approach would allow a party to avoid the requirements of a legislative mandate simply by artful pleading. See *Allis-Chalmers Corp v Lueck*, 471 US 202, 211; 105 S Ct 1904; 85 L Ed 2d 206 (1985). Yet this is exactly what the lead

opinion would allow a plaintiff to do in relation to the requirements of MCL 600.2912a(2). Apparently, according to the justices joining the lead opinion, all a plaintiff need do to avoid the "greater than 50%" requirement in MCL 600.2912a(2) is to omit the words "lost opportunity" in his complaint. Thus, no artfulness is even required to nullify this particular statute under their theory.

Indeed, in light of the lead opinion, the discussions in the various opinions in this case concerning appropriate formulas for determining loss of opportunity seem pointless. For what plaintiff, and what competent plaintiff's attorney, would ever plead a lost-opportunity claim if it could be so easily avoided? Simply put, under the lead opinion's rule, would the lost-opportunity doctrine enacted by the Legislature even continue to exist as a viable legal doctrine in this state? Would a court have any power to apply the actual law, or would it be required to participate in a charade of the plaintiff's (and the lead opinion's) making? As an example, could a public official plaintiff avoid having to prove actual malice in a defamation case by simply leaving the words "public official" out of his pleading? Could a plaintiff suing a public entity entitled to governmental immunity avoid such immunity by simply omitting that the defendant is a public entity from his pleading? Could an independent contractor transmute himself into an employee by simply asserting such in his pleading?

## B. WHICHEVER FORMULA BEST SERVES THE PLAINTIFF

The lead opinion offers no explanation, and I can think of none, to support its alternative "standard percentage increase calculation" formula, other than the fact the justices signing the lead opinion believe that it somehow indicates that plaintiff has

13

suffered a *300 percent* loss of an opportunity!  However, none of this really seems to matter to the justices signing the lead opinion because in the end they conclude that MCL 600.2912a(2) does not require "any particular mathematical formula," and that if "either calculation," or, indeed, some other yet-to-be-discovered calculation, demonstrates a greater than 50 percent lost opportunity, the plaintiff's case may proceed, because "the results must be viewed in the light most favorable to the non-moving party."  This is simply nonsensical.  Although it is true that *evidence* is to be viewed in a light most favorable to the non-moving party, *Dressel v Ameribank*, 468 Mich 557, 561; 664 NW2d 151 (2003), which, as in this case, will almost invariably be the plaintiff, this is the first I have heard of a judicially created rule that we are to construe an unambiguous *law* in a light most favorable to one side or the other.  Needless to say, and for reasons that are apparent, the lead opinion does not bother to cite any authority in support of such a rule. Is there some logical reason for this rule other than an apparent desire by the lead justices to place a finger on the scales of justice on behalf of the plaintiff class?  Is this rule limited to lost-opportunity cases or is it equally applicable to all medical-malpractice actions?  Why is such a rule appropriate in a lost-opportunity case, but not in other realms of the civil law?  When is such a default interpretation of the law warranted, and when is it not?  If the law does not require "any particular formula," why does the lead opinion devote such attention to identifying the two formulas that it does identify?  Why not just devise a third formula under which the plaintiff will *always* prevail?  Could it possibly be

14

that the lead justices may be confusing their own personal political philosophies with the

dictates of the actual law that they pledged to uphold?[8]

## V. CONCLUSION

As I summarized in *Stone:*

> A "lost opportunity" action is one in which it is possible that the bad outcome would have occurred even if the patient had received proper treatment. On the other hand, if there is no question that the proper treatment would have resulted in a good outcome and the patient has suffered a bad outcome, the plaintiff possesses a traditional medical-malpractice action. In order for a traditional medical-malpractice plaintiff to prevail, the plaintiff must prove that the bad outcome was more probably than not caused by the defendant's malpractice. In order for a "lost opportunity" plaintiff to prevail, the plaintiff must prove that the "lost opportunity" to achieve a better result was more probably than not caused by the defendant's malpractice and that the "lost opportunity" was greater than 50 percent. In order to determine whether the "lost opportunity" was greater than 50 percent, the postmalpractice chance of obtaining a better result must be subtracted from the premalpractice chance; the postmalpractice chance must then be subtracted from 100; the former number must be divided by the latter number; and then this quotient must be multiplied by 100 to obtain a percentage. The calculation can be summarized as follows:

---

[8] The lead opinion indicates that the justices signing that opinion now support "Justice CAVANAGH's dissent in *Wickens* [*v Oakwood Healthcare Sys,* 465 Mich 53; 631 NW2d 686 (2001)] that a living person may pursue a claim for loss of opportunity under the circumstances presented in that case." What this gratuitous observation has to do with the instant case, I have not a clue. Do the justices signing the lead opinion also support Justice CAVANAGH's dissent in *People v Gardner*, 482 Mich 41; 753 NW2d 78 (2008), or any one of his other random dissents? Given that three justices previously supported Justices CAVANAGH's dissent (Chief Justice KELLY, and Justices CAVANAGH and WEAVER), by indicating that she now supports *Wickens,* Justice HATHAWAY seems to be signaling that there is now majority support in favor of such dissent. Unfortunately, this type of behavior seems to have become the new majority's modus operandi-- unnecessarily sowing uncertainty, doubt and confusion into the law by gratuitously questioning prior cases decided by the former majority. For more discussion on this, see my dissent in *McCormick v Carrier,* __ Mich __; __ NW2d __ (2010).

$$\frac{(Premalpractice\ chance) - (Postmalpractice\ chance)}{100 - (Postmalpractice\ chance)}$$

> If this percentage is greater than 50, the plaintiff may be able to prevail; if this percentage is 50 or less, then the plaintiff cannot prevail. [*Stone,* 482 Mich at 218-219 (MARKMAN, J., concurring).][9]

As discussed earlier, because it is possible that the bad outcome in this case, i.e., suffering a stroke, would have occurred even if plaintiff had received proper treatment, the instant case is, in fact, a lost-opportunity action, and because plaintiff has raised a genuine issue of material fact regarding whether he suffered a greater than 50 percent loss of an opportunity under MCL 600.2912a, I agree with the majority that the judgment of the Court of Appeals should be reversed and this case should be remanded to the Court of Appeals for it to consider defendants' remaining issue on appeal, i.e., the admissibility of the expert witness testimony proffered by plaintiff.

However, I emphatically disagree with the majority's incoherent analysis and the implications of such analysis. The majority effectively transforms a lost-opportunity action into a traditional medical-malpractice action, for no other apparent reason than to afford plaintiffs with larger potential recoveries. Instead of limiting a plaintiff's recovery

---

[9] However, the present status of the law seems to be, pursuant to the lead opinion and Justice CAVANAGH's concurring opinion, that if the plaintiff's lost opportunity is greater than 50 percent (the calculation of which is anyone's guess in view of the different tests of these two opinions), the plaintiff can bring a traditional medical-malpractice action, but, if the plaintiff's lost opportunity is not greater than 50 percent, then the plaintiff can only bring a lost-opportunity action. And, pursuant to *Fulton,* a lost-opportunity plaintiff must prove that the difference between his premalpractice chance of achieving a better result and his postmalpractice chance of achieving a better result is greater than 50 *percentage points*. Neither of these conclusions is, to say the least, consistent with my own reading of the statute.

16

to the *opportunity* that he or she may have lost as a result of the defendant's negligence, the majority now expands the plaintiff's recovery to include potentially all damages related to his medical condition, even though the plaintiff may well have suffered the condition even had he received *perfect* medical treatment. Thus, having already undermined the Legislature's attempt at medical-malpractice reform, see e.g., *Bush v Shabahang*, 484 Mich 156; 772 NW2d 272 (2009); *Potter v McLeary*, 484 Mich 397; 774 NW2d 1 (2009); and ADM File No. 2009-13, 485 Mich __, __ (order entered February 16, 2010), the majority now embarks upon transforming medical-malpractice law in exactly the opposite direction of that sought by the Legislature. At the same time, the differing formulas, and non-formulas, adopted by the majority, as well as the internal inconsistencies in its analysis, will only produce more confusion in an already confused area of the law, and more litigation in an already heavily litigated area of the law. The clearest principle of law that can be gleaned from the lead opinion is also the least *principled* of its asserted principles-- the adoption of whichever formula best serves the plaintiff. Not much more than this "principle" really needs to be understood concerning the essence of the lead opinion's analysis.

CORRIGAN, J., concurred with MARKMAN, J., with respect to parts IV(A)(2) and (B) only.

S T A T E   O F   M I C H I G A N

SUPREME COURT

RAYMOND O'NEAL,

      Plaintiff-Appellant,

v                                   No. 138180, 138181

ST. JOHN HOSPITAL & MEDICAL
CENTER, RALPH DiLISIO, M.D., and
EFSTATHIOS TAPAZOGLOU, M.D.,

      Defendants-Appellees.

_____

CORRIGAN, J. (*dissenting*).

    I fully join Justice YOUNG's dissenting opinion.  I also join part IV(A)(2) and part

IV(B) of Justice MARKMAN's opinion concurring in the result only.

                                            Maura D. Corrigan

STATE OF MICHIGAN

SUPREME COURT

RAYMOND O'NEAL,

      Plaintiff-Appellant,

v

                                      Nos. 138180, 138181

ST. JOHN HOSPITAL & MEDICAL
CENTER, RALPH DiLISIO, M.D., and
EFSTATHIOS TAPAZOGLOU, M.D.,

      Defendant-Appellees.

_____

YOUNG, J. (*dissenting*).

Our new Chief Justice established the "agenda" for the newly reconstituted Court

in her recent comments captured by the press:

> **We the new majority [Chief Justice KELLY and Justices CAVANAGH, WEAVER, and HATHAWAY] will get the ship off the shoals and back on course, and we will undo a great deal of the damage that the Republican-dominated court has done. Not only will we not neglect our duties, we will not sleep on the bench.**[1]

---

[1] *She Said*, Detroit Free Press, December 10, 2008, p 2A. Chief Justice KELLY objects that I "continue to quote and misleadingly characterize a statement [she] made nearly two years ago off the bench." *Ante* at ___ (KELLY, C.J., concurring). As my dissenting opinion in *Univ of Michigan Regents v Titan Ins* Co, ___ Mich ___; ___ NW2d ___ (2010) (YOUNG, J., dissenting), explains at length, my characterization of her statement is not misleading. Chief Justice KELLY's remarks both set an agenda for undoing the precedents of the previous 10 years and are especially mean-spirited in light of the political attacks against former Chief Justice TAYLOR during the 2008 campaign.

There are many cases this term that can be said to exemplify the new majority's commitment to "undo . . . the damage" of the prior majority, but this case certainly qualifies as a first among equals. Here, not only do my colleagues in the "new majority" destroy the doctrinal integrity of medical malpractice law, they do so in highly fractured opinions that will require a Venn diagram for the bench and bar to construct the points at which four of them agree on any governing principle of law. The new majority has thus made it more difficult to determine what it has done today. Perhaps this is intended.

Chaos and confusion in the law only promote *more* litigation. The decisions the new majority has issued today in this case will thus benefit *only* those who profit from litigating medical malpractice cases. The rest of us desire to know what legal rules control our rights and obligations, and we desire and deserve to know them *before* we act. The citizens of this state are entitled to that kind of clarity in the decisions from the state's senior court, not the disorder this Court has sown today. Today's decision returns this Court to an era in which the bench and bar must decipher this Court's split opinions in order to figure out what principles of law they collectively articulate.[2] It is no small challenge to respond in dissent to the various opinions that shred our medical malpractice laws.

---

[2] See, e.g., *Smith v Dep't of Pub Health*, 428 Mich 540; 410 NW2d 749 (1987), for a model case in the same chaotic vein as today's split decisions. It exemplifies the era to which this Court returns in this case.

Despite the Legislature's codification of the traditional obligation to prove that alleged malpractice "more probably than not" caused a plaintiff's injury,[3] 20 years ago, in *Falcon v Mem Hosp*, this Court waded into the realm of policy-making and judicially created the lost opportunity doctrine as an exception to the traditional and statutorily codified causation standard of proof.[4] Even after the Legislature subsequently recognized the lost opportunity doctrine,[5] it also expressly retained the traditional requirement that "[i]n an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants."[6]

Until today, this Court has always made clear that when a *traditional* medical malpractice claim was at issue, the more-probable-than-not standard of causation applied and required the plaintiff to "'exclude other reasonable hypotheses with a fair amount of certainty.'"[7] However, as the Court did in *Falcon*, today the majority makes a radical transformation of medical malpractice law and again jettisons traditional causation doctrine by equating *causation* of the injury with *risk* of the injury. But, unlike in *Falcon*, the new majority here does not recognize merely an *exception* to the traditional

---

[3] 1977 PA 272.

[4] *Falcon v Mem Hosp*, 436 Mich 443; 462 NW2d 44 (1990).

[5] See MCL 600.2912a, as amended by 1993 PA 78.

[6] MCL 600.2912a(2).

[7] *Skinner v Square D Co*, 445 Mich 153, 166; 516 NW2d 475 (1994) (citation omitted).

malpractice requirement of "but for" causation, *it essentially eliminates the traditional rule entirely by importing that exception into all malpractice cases.* In declaring this case to be a "traditional" medical malpractice claim, the new majority applies the relaxed causation rules that previously had applied *only* to lost opportunity claims. After today, therefore, *all* malpractice claims will be treated under relaxed causation principles previously applied only to lost opportunity claims. This is a tectonic shift in our law, for which there is no basis but the preference of the justices in the new majority to foster more legal chaos that will promote litigation in this area of the law. This shift is significant because a traditional medical malpractice injury creates liability for *the entire injury*, while a lost opportunity claim creates liability only for that portion of the increased risk of injury attributable to a defendant.[8] Make no mistake: Although Justice CAVANAGH feigns that he is unaware of the significant change in the law being made in this case, the reduced burden of persuasion and the broader scope of damages permitted is the reason the new majority now applies lost opportunity causation principles to *all* medical malpractice claims.[9]

Rather than attempting to give meaning to the words of the statute at issue in this case, the new majority performs a spectacularly hubristic feat in treating a statutory

---

[8] See *Falcon*, 436 Mich at 471 (opinion by LEVIN, J.) ("In this case, 37.5 percent times the damages recoverable for wrongful death would be an appropriate measure of damages.").

[9] See n 52 of this opinion for further elaboration on the significance of Justice CAVANAGH's repudiation of the position he took just two years ago in *Stone v Williamson*, 482 Mich 144, 175-177; 753 NW2d 106 (2008) (opinion by CAVANAGH, J.).

4

medical malpractice claim as though it were a mere matter of common law and thus subject to its revisionary powers. What is more, these justices have decided to use those extraconstitutional powers to circumvent the Legislature's explicit decision to retain traditional causation rules. The new majority has chosen "free form" to change the law to match its policy preference that no legal doctrines shall exist to eliminate *any* claim of medical malpractice—even those doctrines codified by our Legislature to accomplish this very goal.

For someone who campaigned on the theme that more of this Court's precedent should be preserved,[10] we are surprised at how eagerly Justice HATHAWAY has striven in this case to overturn precedent—even to the extent of offering her own new views that precedent is not a serious barrier to any change desired by the new majority.[11]

The dicta in Justice HATHAWAY's opinion bears out her newfound position on stare decisis because her opinion purports to opine on "the full scope and extent of loss-of-opportunity claims,"[12] even while denying that such a claim is involved in *this* case. In doing so, Justice HATHAWAY engages in a completely gratuitous assault on this

---

[10] Berg, *Hathaway attacks*, Michigan Lawyers Weekly, October 27, 2008 ("'People need to know what the law is,' Hathaway said. 'I believe in stare decisis. Something must be drastically wrong for the court to overrule.'"); *Lawyers' election guide: Judge Diane Marie Hathaway*, Michigan Lawyers Weekly, October 30, 2006 (quoting Justice HATHAWAY, then running for a position on the Court of Appeals, as saying that "[t]oo many appellate decisions are being decided by judicial activists who are overturning precedent").

[11] See, e.g., *Univ of Mich Regents v Titan Ins Co*, ___ Mich ___, ___; ___ NW2d ___ (2010) (HATHAWAY, J., concurring).

[12] *Ante* at ___ (opinion by HATHAWAY, J.).

Court's decision in *Wickens v Oakwood Healthcare Sys.*[13] *Wickens* involved a claim for the lost opportunity *to survive*, and it was brought by a living plaintiff—someone who had not yet *lost* her opportunity to survive. *No* justice even contends that plaintiff in this case has asserted a claim for the lost opportunity to survive, and therefore it is completely unnecessary for Justice HATHAWAY to opine on whether the majority or dissent correctly interpreted the question whether a living plaintiff could recover for the loss of an opportunity to survive.

Ordinarily, this fact would hinder any justice from engaging in a discussion on the scope of a claim for the lost opportunity to survive that is not implicated in the case before the Court. Justice HATHAWAY, though, is not constrained to consider only the legal issues *she* claims are involved here because, consistent with the new majority's "agenda,"[14] she has a desire to overrule in one fell swoop as many cases decided by the "Republican-dominated court" as she can. Unfazed by the inconvenient fact that *Wickens* is irrelevant to any question posed by this case, Justice HATHAWAY's opinion observes that it "agree[s] with Justice CAVANAGH'S partial dissent in *Wickens* . . . ."[15] Such dicta do not yet operate to overturn this Court's decision in *Wickens*. Nevertheless, given that Justice HATHAWAY is now the fourth sitting justice on this Court to support the partial

---

[13] *Wickens v Oakwood Healthcare Sys*, 465 Mich 53; 631 NW2d 686 (2001).

[14] See the text accompanying n 1 of this opinion.

[15] *Ante* at ___ (opinion by HATHAWAY, J.).

6

dissenting opinion in *Wickens*, it is safe to conclude that the majority opinion in *Wickens* has, more probably than not, lost a substantial part of its opportunity to survive.[16]

Finally, the new majority overrules the Court of Appeals decision in *Fulton v William Beaumont Hosp* to the extent it is inconsistent with their opinions.[17]  However, again, the new majority overreaches; *Fulton* applies <u>only</u> to lost opportunity cases, *not* to traditional medical malpractice cases, and the new majority's decision to convert claims previously considered lost opportunity claims into traditional medical malpractice claims serves to eliminate the application of *Fulton*.  The new majority's deliberate decision to repudiate *Fulton* in this expansive manner, provides further support for my claim that it now applies lost opportunity principles to *all* medical malpractice claims.

For these reasons and more, I vigorously dissent.  I believe that the new majority has intentionally mischaracterized this as a "traditional" medical malpractice claim because plaintiff's expert testimony unquestionably established that the alleged malpractice was *not* the "but for" cause of plaintiff's injury.  Were the new majority's characterization of this case as a traditional medical malpractice claim accurate, I would affirm for failure of proofs. However, because I believe this to be a lost opportunity case,

---

[16] One could read this dicta in Justice HATHAWAY's opinion as a signal that the new majority will overrule *Wickens*.  However, the majority has *already* so signaled in its order granting leave to appeal in *Edry v Adelman*, 485 Mich 901 (2009).  *Edry* was decided on narrow evidentiary grounds, *Edry v Adelman*, 486 Mich ___; ___ NW2d ___ (2010), but, as Justice HATHAWAY's decision in this case exemplifies, its decision was decidedly not a reaffirmation of the continued vitality of *Wickens*.

[17] *Fulton v William Beaumont Hosp*, 253 Mich App 70; 655 NW2d 569 (2002).

7

I would vacate as improvidently granted our September 30, 2009, order granting leave to appeal. I continue to adhere to the position stated in the lead opinion in *Stone v Williamson* that the second sentence of MCL 600.2912a(2) codifying the lost opportunity remedy is unenforceable as enacted.[18] Because the Legislature has not clarified the intention of its 1993 amendment of § 2912a(2), vacating the grant order is the most appropriate course of action.

## I. FACTS AND PROCEDURAL HISTORY

Because none of the opinions that collectively create a majority elaborates on the facts necessary to decide this case, I present the following complete recitation of the pertinent facts and procedural history of this case.

Plaintiff, Raymond O'Neal, suffers from sickle cell anemia, a genetic condition that produces an increased amount of abnormally shaped red blood cells in his bloodstream.[19] In January 2003, plaintiff's progressively worsening chest pain developed into acute chest syndrome (ACS), a known complication of sickle cell anemia.[20] To treat ACS, a patient must undergo blood transfusions to reduce the amount of abnormal red blood cells. The difference between and effectiveness of two types of blood transfusions—standard transfusions and exchange transfusions—is at issue in this case. Standard transfusions add healthy red blood cells to the patient's existing blood supply

---

[18] *Stone*, 482 Mich at 144 (opinion by TAYLOR, C.J.).

[19] Beers & Berkow, eds, *The Merck Manual of Diagnosis and Therapy* (17th ed) (Whitehouse Station, NJ: Merck & Co, Inc, 1999), pp 877-878.

[20] *Id.* at 879.

and thereby reduce the patient's percentage of abnormal red blood cells. Exchange transfusions are more complicated, but they also more aggressively treat the blood abnormality because they physically remove existing abnormal red blood cells and replace them with healthy red blood cells.

On January 23 through 24, 2003, plaintiff received a standard transfusion of three units of blood cells. He received two additional units of blood cells in another standard transfusion on January 28, 2003. Plaintiff suffered a stroke on the right side of his brain on February 1, 2003. Plaintiff received a third transfusion—an exchange transfusion—on February 2 through 3, 2003. Plaintiff's condition stabilized after this final transfusion, but he alleged permanent injury as a result of the stroke, including partial paralysis of his left leg and loss of function of his left hand and arm.

Plaintiff filed the instant medical malpractice complaint, alleging that defendants failed to comply with the appropriate standard of care, which required them to "arrange for exchange transfusions" to treat plaintiff's ACS on or before January 28, 2003. He also alleged that "[p]erformance of [an] exchange transfusion prior to the . . . stroke would have prevented the stroke from occurring."

Plaintiff retained and deposed three expert witnesses to testify on his behalf on the issue of causation. Dr. John Luce, a pulmonary care specialist, testified that reducing plaintiff's abnormal hemoglobin count to under 30 percent would have made it "probable that he would not have" suffered the stroke, although he acknowledged that plaintiff still could have suffered the stroke even with such a reduced abnormal hemoglobin count. Because no data existed on the frequency of strokes in adult sickle cell patients, Dr.

Richard Stein, a hematologist, extrapolated from existing data on the effects of aggressive transfusion therapy on children with sickle cell disease. He testified that "more likely than not" plaintiff would have avoided a stroke if he had received aggressive transfusion therapy, what plaintiff alleged is the appropriate standard of care. Dr. Griffin Rodgers, also a hematologist, provided the most detailed testimony regarding the causal relationships between the stroke, plaintiff's underlying medical condition, and defendants' alleged malpractice. He explained that sickle cell patients generally have a baseline risk of stroke that is significantly higher than the average population. Moreover, plaintiff's ACS further increased his baseline risk of stroke to between 10 and 20 percent. Dr. Rodgers testified that, with aggressive transfusion therapy, the plaintiff's risk of stroke would have "been cut in half," that is, to between 5 and 10 percent. Stated otherwise, plaintiff's opportunity to avoid a stroke would have been between 90 and 95 percent with aggressive transfusion therapy, but it was reduced to between 80 and 90 percent without aggressive transfusion therapy. Thus, under either treatment regime, plaintiff's experts testified that it was more likely than not that plaintiff would *avoid* a stroke.

Defendants moved for summary disposition, arguing that Dr. Rodgers's testimony regarding plaintiff's lost opportunity to avoid a stroke failed to satisfy the requirement of MCL 600.2912a(2)[21] and *Fulton v William Beaumont Hosp*,[22] that the opportunity to

---

[21] MCL 600.2912a(2) provides, in pertinent part: "In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%."

10

achieve a better result must decrease by more than 50 percentage points. The trial court denied defendants' motion, noting that defendants "[didn't] have a clue about what [*Fulton*] says."

After the Court of Appeals denied defendants' interlocutory application for leave to appeal, in lieu of granting leave to appeal, we remanded this case to the Court of Appeals for consideration as on leave granted.[23] On remand, the Court of Appeals reversed the trial court's denial of summary disposition in an unpublished opinion per curiam.[24] The majority opinion held that plaintiff's claim was a lost opportunity claim, that *Fulton* required the loss of opportunity to be greater than 50 percentage points, and that the loss of opportunity here was, at most, 15 percentage points. The concurring opinion concluded that plaintiff also failed to present sufficient evidence of proximate causation because his "preexisting medical condition" precluded him from satisfying "his burden of establishing the existence of a genuine factual dispute concerning whether defendants' alleged professional negligence 'more probably tha[n] not' proximately caused his stroke."[25]

We granted leave to appeal and directed the parties to brief:

---

[22] *Fulton v William Beaumont Hosp*, 253 Mich App 70; 655 NW2d 569 (2002).

[23] *O'Neal v St John Hosp & Med Ctr*, 477 Mich 1087 (2007).

[24] *O'Neal v St John Hosp & Med Ctr*, unpublished opinion per curiam of the Court of Appeals, issued November 4, 2008 (Docket Nos. 277317 and 277318).

[25] *Id.* at 2 (JANSEN, J., concurring).

(1) whether the requirements set forth in the second sentence of MCL 600.2912a(2) apply in this case; (2) if not, whether the plaintiff presented sufficient evidence to create a genuine issue of fact with regard to whether the defendants' conduct proximately caused his injury; or (3) if so, whether *Fulton v William Beaumont Hosp*, 253 Mich App 70 (2002), was correctly decided, or whether a different approach is required to correctly implement the second sentence of § 2912a(2).[26]

## II. LEGAL BACKGROUND

The lead opinion in *Stone* aptly summarized the pertinent legal background relevant to this case, including the distinction between traditional malpractice claims and lost opportunity claims that the majority now eviscerates:

> In the first Michigan case to refer to the legal theory of "the value of lost chance," the Court of Appeals explained: "This theory is potentially available in situations where a plaintiff cannot prove that a defendant's actions were the cause of his injuries, but can prove that the defendant's actions deprived him of a chance to avoid those injuries." *Vitale v Reddy*, 150 Mich App 492, 502; 389 NW2d 456 (1986). The Court in *Vitale* noted that allowing such claims would expand existing common law, and it declined to do so, stating that such a decision "is best left to either the Supreme Court or the Legislature." *Id.* at 504. . . .

> In accord with this analysis, this Court has stated: "The lost opportunity doctrine allows a plaintiff to recover when the defendant's negligence *possibly*, i.e., [by] a probability of fifty percent or less, caused the plaintiff's injury." *Weymers v Khera*, 454 Mich 639, 648; 563 NW2d 647 (1997) (emphasis added). The *Weymers* Court aptly described the lost-opportunity doctrine as "the antithesis of proximate cause." *Id.* In cases in which the plaintiff alleges that the defendant's negligence more probably than not caused the injury, the claim is one of simple medical malpractice. *Id.* at 647-648.

> In *Falcon v Mem Hosp*, 436 Mich 443; 462 NW2d 44 (1990), this Court first recognized a claim for lost opportunity to survive. *Falcon* was a wrongful-death case in which this Court allowed a claim to go forward

---

[26] *O'Neal v St John Hosp & Med Ctr*, 485 Mich 901 (2009).

12

even though the plaintiff's granddaughter would have had only a 37.5 percent chance of surviving a medical accident had she received proper care. Because proper medical procedures had not been followed, the granddaughter's chance of surviving the accident went to essentially zero. The lead opinion in *Falcon* admitted that the plaintiff could not show that the malpractice had more likely than not caused her granddaughter's death, but could show that it had caused her granddaughter to lose a "substantial opportunity of avoiding physical harm." *Id.* at 470 (LEVIN, J.). The lead opinion disavowed the traditional rule that requires a plaintiff to show that, but for the defendant's negligence, the patient would not have suffered the physical harm, saying that the "more probable than not standard, as well as other standards of causation, are analytic devices—tools to be used in making causation judgments." *Id.* at 451. Instead, despite the fact that the plaintiff could not show that the doctor's malpractice had more probably than not caused her granddaughter's death, the plaintiff had a claim because the malpractice did cause her granddaughter harm. The 37.5 percent chance for a better outcome was "hardly the kind of opportunity that any of us would willingly allow our health care providers to ignore." *Id.* at 460. This harm occurred *before* the granddaughter's death, at the moment "[w]hen, by reason of the failure to implement [certain] procedures," she was denied any opportunity of living. *Id.* at 469, 471 n 44. The lead opinion characterized its holding as requiring the plaintiff to show, more probably than not, that the malpractice reduced the opportunity of avoiding harm: "failure to protect [the granddaughter's] opportunity of living." *Id.* at 469. Loss of her 37.5 percent opportunity of living, the lead opinion stated, "constitutes a loss of a substantial opportunity of avoiding physical harm." *Id.* at 470.

The lead opinion in *Falcon* thus concluded that the loss-of-opportunity claim accrued not when the patient died, but at the moment she went from having a 37.5 [percent] chance of survival to having no chance of survival. Under this theory, a plaintiff would have a cause of action independent of that for the physical injury and could recover for the malpractice that caused the plaintiff to go from a class of patients having a "good chance" to one having a "bad chance." Without this analysis, the plaintiff in *Falcon* would not have had a viable claim because it could not have been shown that the defendant more probably than not caused the physical injury. Until *Falcon*, medical-malpractice plaintiffs alleging that the defendant's act or omission hastened or worsened the injury (such as by failing to diagnose a condition) had to prove that the defendant's malpractice more probably than not was the proximate cause of the injury. See, e.g., *Morgan v Taylor*, 434 Mich 180; 451 NW2d 852 (1990);

*Naccarato v Grob*, 384 Mich 248, 252; 180 NW2d 788 (1970); *Skeffington v Bradley*, 366 Mich 552; 115 NW2d 303 (1962).

When the Court decided *Falcon*, MCL 600.2912a read:

"In an action alleging malpractice the plaintiff shall have the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:

"(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

"(b) The defendant, if a specialist, failed to provide the recognized standard of care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury."

Three years after *Falcon*, the Legislature enacted 1993 PA 78, amending MCL 600.2912a to add the second subsection. In its entirety, the statute as amended reads:

"*(1) Subject to subsection (2),* in an action alleging malpractice, the plaintiff *has* the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:

"(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice *or care* in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

"(b) The defendant, if a specialist, failed to provide the recognized standard of *practice or* care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

*"(2) In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%."* [New language emphasized.]

As can be seen, the Legislature retained the already-existing language, making it subsection 1 of the statute. Both subsection 1(a) and subsection 1(b) require the plaintiff to show that, "as a proximate result of the defendant failing to provide [the appropriate standard of practice or care], the plaintiff suffered an injury." Further, the Legislature added subsection 2. Specifically, the first sentence of this new subsection codifies and reiterates the common-law requirement that a plaintiff show that the defendant's malpractice more probably than not caused the plaintiff's injury. The second sentence of subsection 2 adds that, in medical-malpractice cases, a "plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%." However, one must keep in mind that the relevant caselaw when subsection 2 was enacted held that the lost-opportunity doctrine applies *"in situations where a plaintiff cannot prove that a defendant's actions were the cause of his injuries . . . ." Vitale*, [150 Mich App] at 502 (emphasis added). That is, the first sentence of subsection 2 requires plaintiffs in every medical-malpractice case to show the defendant's malpractice proximately caused the injury while, at the same time, the second sentence refers to cases in which such proof not only is unnecessary, but is impossible.[27]

Thus, in contrast with traditional malpractice claims, the very nature of the lost opportunity doctrine allows a plaintiff to recover *in the absence of proximate causation between the alleged malpractice and the physical injury suffered*. The lead opinion in *Stone* determined that "the two sentences of subsection 2 create a paradox, allowing

---

[27] *Stone*, 482 Mich at 152-157 (opinion by TAYLOR, C.J.).

15

claims in the second sentence while precluding them by the first sentence."[28]  In this case, Justice HATHAWAY's opinion and Justice CAVANAGH's concurring opinion altogether avoid the implications of this paradox by essentially applying the lost opportunity analysis (which never required "but for" causation) to a traditional medical malpractice claim that, until today, *always required* "but for" causation.  In doing so, the new majority radically alters proximate causation doctrine by casting aside the traditional component of "but for" causation and by replacing causation of the injury with consideration only of the *increased* risk of the injury.  This is a revolutionary change in our law and represents a change that not even the *Falcon* Court dared to make.

A necessary component of proximate causation is "but for" causation, or causation in fact.[29]  As this Court has previously held:

> As a matter of logic, a court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries.
>
> Generally, an act or omission is a cause in fact of an injury only if the injury could not have occurred without (or "but for") that act or omission.  While a plaintiff need not prove that an act or omission was the *sole* catalyst for his injuries, he must introduce evidence permitting the jury to conclude that the act or omission was *a* cause.
>
> It is important to bear in mind that a plaintiff cannot satisfy this burden by showing only that the defendant *may* have caused his injuries.  Our case law requires more than a mere possibility or a plausible

---

[28] *Id.* at 157.

[29] *Weymers v Khera*, 454 Mich 639, 647; 563 NW2d 647 (1997), citing *Skinner*, 445 Mich at 162-163.

16

explanation. Rather, a plaintiff establishes that the defendant's conduct was a cause in fact of his injuries only if he "set[s] forth specific facts that would support a reasonable inference of a logical sequence of cause and effect."[30]

As Justice CAVANAGH has himself previously concluded, plaintiffs must present evidence of proximate causation that "'must exclude other reasonable hypotheses with a fair amount of certainty.'"[31] By allowing plaintiff's claim to proceed as a traditional medical malpractice claim, the new majority today eviscerates the distinction between the weaker causation allowed in lost opportunity claims and the "but for" causation that has *always* been required in traditional medical malpractice claims.

## III. APPLICATION

### A. PLAINTIFF ASSERTED A LOST OPPORTUNITY CLAIM BECAUSE THERE IS NO "BUT FOR" CAUSATION BETWEEN THE ALLEGED MALPRACTICE AND THE PHYSICAL INJURY SUFFERED.

As stated, the crux of a lost opportunity claim is that a plaintiff cannot show that, more probably than not, the alleged malpractice proximately caused his injuries. This is because a plaintiff need only show that the alleged malpractice merely reduced his opportunity to achieve a better result. Accordingly, whether a claim is a traditional malpractice claim or a claim for the loss of an opportunity to achieve a better result depends on whether the alleged malpractice *proximately caused* the alleged injury.

---

[30] *Craig v Oakwood Hosp*, 471 Mich 67, 87; 684 NW2d 296 (2004), quoting *Skinner*, 445 Mich at 174.

[31] *Skinner*, 445 Mich at 166 (CAVANAGH, C.J.) (citation omitted).

17

Contrary to the new majority's position, this case presents a prototypical lost opportunity claim because *no proximate causation exists between the alleged malpractice and plaintiff's physical injury.* Plaintiff's experts testified that plaintiff's underlying medical condition—sickle cell anemia complicated by ACS—*increased his risk of stroke* above that of a healthy person and even above that of a sickle cell patient who has not developed ACS. Plaintiff's underlying medical condition created a heightened chance of suffering a stroke, *with or without the alleged malpractice.* As Dr. Rogers, who provided the most detail of plaintiff's causation experts, testified, plaintiff would have had a 5 to 10 percent chance of suffering a stroke *even if he had been treated according to the plaintiff's proposed standard of care.*

**The evidence here, therefore, does <u>not</u> "'exclude other reasonable hypotheses [of the cause of injury] with a fair amount of certainty,'"**[32] as is required to prove "but for" causation in a traditional medical malpractice action. Plaintiff's expert testified that, in the absence of the alleged medical malpractice, plaintiff had between a 90 percent and 95 percent chance of avoiding a stroke. The alleged medical malpractice reduced plaintiff's chance of avoiding a stroke to between 80 percent and 90 percent. Even looking at the evidence in the light most favorable to the plaintiff, there is no basis for a fact-finder to conclude that defendants' actions more probably than not *caused* plaintiff's injury. But this is unimportant because the new majority now only requires causation for the *increased risk of injury.*

---

[32] *Id*. (emphasis added).

Simply stated, the plaintiff has not asserted, and neither Justice HATHAWAY's opinion nor Justice CAVANAGH's concurring opinion assert—that the alleged medical malpractice increased his chance of suffering a stroke by the more than 50 percentage points required to prove proximate causation.[33] **This fact irrefutably establishes that the plaintiff asserts a lost opportunity claim, not a traditional medical malpractice claim.**

B. THE CONCLUSION THAT PLAINTIFF HAS ASSERTED A TRADITIONAL MEDICAL MALPRACTICE CLAIM AND HAS SATISFIED THE REQUIREMENTS OF "BUT FOR" CAUSATION IS A DANGEROUS DEPARTURE FROM TRADITIONAL CAUSATION REQUIREMENTS.

As stated, in determining that plaintiff's claim is a traditional medical malpractice claim, the new majority today applies relaxed causation rules that previously had applied *only* to lost opportunity claims—claims involving an increased *risk of injury* that did not rise to the level of proximate causation. These relaxed rules are inconsistent with the position that three of the justices of the new majority have taken previously on what evidence is required for a plaintiff to prove a traditional medical malpractice claim.[34] Such claims have *always* required "but for" causation. After today's shift, therefore, *all*

---

[33] See *Falcon v Mem Hosp*, 436 Mich 443, 450; 462 NW2d 44 (1990) (opinion by LEVIN, J.) (characterizing the traditional approach to "but for" causation as "measured as more than fifty percent" and concluding that a 37.5 percentage point reduction in the opportunity for surviving could not prove "but for" causation). **Thus no one, not even those in the *Falcon* decision who created an *exception*, has ever required less than a "more than 50 percentage point" change in order to establish a *traditional* medical malpractice claim.** Just two years ago, Justices CAVANAGH, WEAVER, and KELLY *reaffirmed* this position. See *Stone*, 482 Mich at 175-177 (opinion by CAVANAGH, J.).

[34] See *id.*

19

malpractice claims will be established using principles that could only have applied to lost opportunity claims. Few can miss how significant a departure this is from all of this Court's medical malpractice jurisprudence that preceded this case.

## 1. THREE JUSTICES TODAY REPUDIATE THE TRADITIONAL CAUSATION PRINCIPLES THAT THEY *REAFFIRMED* JUST TWO YEARS AGO.

The new majority appears to be of the view that the less said about its radical rewriting of this statute the better. When a judge is "doing" policy rather than interpreting the law, it is apparently not required to maintain a consistent position or explain a fundamental change in position. Certainly, such disclosures are probably not desired by jurists whose positions are undergoing radical "revision." I commend the reader to compare the positions taken today by Chief Justice KELLY and Justices CAVANAGH and WEAVER with those taken just two years ago in *Stone*.[35] These three justices now *repudiate* the traditional proximate cause requirements that they previously recognized and applied at that time.

In *Stone*, Justice CAVANAGH, writing for himself and Justices KELLY and WEAVER, held that a traditional medical malpractice action required "but for" causation. He specifically posed a hypothetical example in which a plaintiff's opportunity to achieve a better result was reduced by 40 percentage points, from 80 percent to 40 percent. Thus, this hypothetical plaintiff's risk of suffering a bad result increased from 20 percent to 60 percent as a result of the alleged medical malpractice. According to Justice CAVANAGH

---

[35] See *id*. Justice CAVANAGH at least has the forthrightness to indicate that he today repudiates this position. *Ante* at ___ (CAVANAGH, J., concurring).

just two years ago, this hypothetical plaintiff "could not meet the more-probably-than-not standard of causation . . . ."[36] Today these same three justices declare that a much smaller reduction in the opportunity to achieve a better result—from 90 to 95 percent to 80 to 90 percent—now satisfies the causation standard of a *traditional* malpractice case. This is not a product of the rule of law. This is a naked display of judicial whimsy and aggressive policy-making.

## 2. JUSTICE HATHAWAY'S OPINION MISREADS CASELAW TO REDEFINE PROXIMATE CAUSE AND TO DO AWAY WITH THE TRADITIONAL REQUIREMENT THAT A PLAINTIFF PROVE A "BUT FOR" CAUSE UNDER THE MORE-PROBABLE-THAN-NOT STANDARD

Justice HATHAWAY's opinion places much emphasis on the fact that our caselaw indicates that "a plaintiff need not prove that an act or omission was the *sole* catalyst for his injuries,"[37] in recognition that any given injury may have more than one proximate cause. It then uses this fact of logic and causation to create a false distinction that radically refashions proximate causation and negates the traditional requirement—as previously articulated even by Justice CAVANAGH—that proof of "but for" causation must "*exclude* other reasonable hypotheses with a fair amount of certainty."[38]

The proposition that any injury may have more than one proximate cause is an unremarkable one for anyone who understands the principles of "but for" causation. An

---

[36] *Stone*, 482 Mich at 177 (opinion by CAVANAGH, J.).

[37] *Craig*, 471 Mich at 87.

[38] *Skinner*, 445 Mich at 166 (emphasis added; quotation marks and citation omitted).

injury that involves a *series* of individual occurrences before it is manifested will have multiple "but for" causes. **However, in such a case, _each_ of these causes *must be proved to have _produced_ the injury under the more-probable-than-not standard*, not merely proved to have *increased the risk of injury*, as this case does.**

One of this Court's cases on traditional causation, *Brackins v Olympia, Inc*, illustrates this point.[39] The plaintiff, a roller skating instructor, fell while roller skating at the defendant's rink. He alleged that another skater had clipped his right skate and that, "as a result his skates became locked with his right foot and skate behind his left skate."[40] Furthermore, the plaintiff claimed that he could not have prevented the fall "because his left skate struck a ridge or inequality in the floor of the rink . . . ."[41] The defendant rink owner sought summary disposition because it claimed that the proximate cause of the plaintiff's injury was the other skater clipping the plaintiff's skate, not the flaw in the rink surface. To be sure, the other skater's action *was* a "but for" cause of the plaintiff's injury, as the injury would not have occurred without it. However, this Court concluded that the skating rink surface was *also* a proximate cause of the plaintiff's injury:

> Defendant is not absolved from liability for its negligence because of the act of the other skater . . . . The proofs support the conclusion . . . that plaintiff fell because of the roughness of, or the inequality in, the floor of the skating rink. Defendant's negligence, if not the sole proximate cause of the accident, was, in any event, *a* proximate cause.[42]

---

[39] *Brackins v Olympia, Inc*, 316 Mich 275; 25 NW2d 197 (1946).

[40] *Id.* at 277.

[41] *Id*.

[42] *Id.* at 283 (emphasis added).

Each of the "but for" causes in *Brackins* could be proved with near certainty. Accordingly, the *Brackins* Court concluded that *both* "but for" causes more probably than not *directly* caused the plaintiff's injury, and therefore it affirmed the jury's award of damages to the plaintiff against the defendant. ***Nevertheless, in recognizing that an injury may have more than one "but for" cause, this Court has always, until now, required the traditional burden of proving that each particular "but for" cause more probably than not produced the injury.***[43]

The dual "but for" causes in *Brackins* are very different from the situation in the instant case. Here, all that plaintiff can show is that defendants' alleged malpractice exacerbated plaintiff's *preexisting* sickle cell anemia to the extent of increasing his *risk* of

---

[43] Justice HATHAWAY claims that this position "would allow recourse for the negligent actions of medical providers only in those instances in which one provider's conduct is at issue and only when no preexisting medical condition exists." *Ante* at ___ (opinion by HATHAWAY, J.). This is patently false. First, as stated, there *can* be multiple "but for" causes for a particular injury, including the negligent conduct of *multiple* medical providers. Each of these hypothetical negligent acts, however, must *themselves* be "but for" causes, like the chain reaction of events that caused the roller skating injury in *Brackins*. Second, a medical provider's negligence *may*, more probably than not, be a "but for" cause of an injury *even when the plaintiff has a preexisting condition.* This was the very situation that this Court encountered in *Stone*. The plaintiff in *Stone* alleged that a timely diagnosis of an aortic aneurysm would have given him a 95 percent chance of attaining a good result. Instead, his aneurysm ruptured, requiring emergency surgery and ultimately amputation of his legs. According to the plaintiff's experts, "misdiagnosed patients whose aneurysms rupture have only a 10 percent chance to achieve a good result." *Stone*, 482 Mich at 148 (opinion by TAYLOR, C.J.). Thus, even though the plaintiff had a preexisting medical condition, the defendants' misconduct increased the plaintiff's probability of suffering a bad result from 5 percent to 90 percent. This increase of 85 percentage points provided a sufficient factual basis to defeat the defendant's motion for judgment notwithstanding the verdict.

suffering a stroke by between 5 and 10 percentage points. Plaintiff has simply not proved that the alleged malpractice *caused* his stroke, nor has he "exclude[d]" the "other reasonable hypothes[i]s"—his preexisting sickle cell anemia—"with a fair amount of certainty."[44] Thus, plaintiff's preexisting sickle cell anemia could well have operated to injure him *even in the absence of defendants' alleged malpractice*.

### 3. JUSTICE HATHAWAY'S AND JUSTICE CAVANAGH'S OPINIONS TAKE INAPPROPRIATE LIBERTIES WITH PLAINTIFF'S EXPERT STATISTICAL EVIDENCE BY FAILING TO COMPARE LIKE WITH LIKE

Even in applying their radical new approach to proximate causation, the justices in the new majority *only* reach their desired result by manipulating the expert's statistical evidence in ways inconsistent with the expert's own use of the statistical evidence and, similarly, in ways inconsistent with the uncontroversial and essential principle of statistical methodology of comparing "like with like." The new majority's inappropriate use of the statistical evidence presented in this case provides further proof that it is engaging in result-driven jurisprudence. Only this motivation could support such a mathematically illiterate presentation.

Justice HATHAWAY's opinion declares, under the guise of requiring "results [to] be viewed in the light most favorable to the nonmoving party,"[45] that *any* mishmash of figures that yields a result of greater than 50 percent will establish proximate causation between the alleged malpractice and plaintiff's injury sufficient to defeat summary

---

[44] *Skinner*, 445 Mich at 166 (quotation marks and citation omitted).

[45] *Ante* at ___ (opinion by HATHAWAY, J.).

disposition. Thus, while Justice HATHAWAY's opinion expressly declines to adopt any *particular* mathematical formula for determining whether proximate cause exists in a given case, it essentially adopts *every* formula that an attorney or judge can manufacture. This is not a serious analysis—"statistical" or otherwise. Justice HATHAWAY's opinion is simply an invitation for the artful manipulation of probability figures and calls to mind the adage Mark Twain once attributed to Benjamin Disraeli, that there are "three kinds of lies: lies, damned lies, and statistics."[46]

Two of the formulas that Justice HATHAWAY's opinion identifies by name bear closer analysis. Her opinion indicates that the evidence in this case can be "viewed as a standard percentage increase calculation. . . ."[47] The flaw in using this "standard percentage increase calculation" in a traditional medical malpractice case is obvious. **Such a calculation would turn the facts of *Falcon*—a case in which *no* justice believed that the plaintiff could prove "but for" causation using a more-probable-than-not standard[48]—into a traditional medical malpractice case.**

---

[46] Twain, *My Autobiography: "Chapters" from the North American Review* (Mineola, NY: Dover Publications, Inc, 1999), p 208.

[47] *Ante* at ___ (opinion by HATHAWAY, J.).

[48] *Falcon*, 436 Mich at 460 (opinion by LEVIN, J.) ("[I]t cannot be said, more probably than not, that [defendant] caused [plaintiff's] death."); *id.* at 472-473 (BOYLE, J., concurring) ("I concur in the recognition of 'lost opportunity to survive' as injury for which tort law should allow recovery in proportion to the extent of the lost chance of survival . . . provided that the negligence of the defendant more probably than not caused the loss of opportunity."); *id.* at 473 (RILEY, C.J., dissenting) ("[I]t is uncontested that the plaintiff cannot show that defendant's negligence caused the decedent's death . . . .").

In *Falcon*, the plaintiff's decedent, Nena Falcon, suffered an amniotic fluid embolism, "an unpreventable complication" of childbirth.[49] A woman who suffers this complication has a 62.5 percent probability of dying, even if it is treated immediately. Because of alleged malpractice, however, Nena Falcon's amniotic fluid embolism was not treated immediately. This alleged malpractice increased her chance of death to 100 percent.[50] Under the "standard percentage increase calculation" used by Justice HATHAWAY to support her radical departure from requiring traditional proximate causation in this case, the defendant's alleged malpractice in *Falcon* was responsible for increasing Nena Falcon's chance of dying by 37.5 percentage points over the preexisting 62.5 percentage point chance of dying. This represents a 60 percent increase in her chance of dying (37.5/62.5), and satisfies Justice HATHAWAY's conclusion that *any* formula that reaches the magic number of more than 50 percent is satisfactory. Justice HATHAWAY's opinion has, therefore, taken a judicially created aberration of proximate causation, *Falcon*, and applied it so that she can satisfy the proximate cause component of a traditional medical malpractice claim. Fortunately, Justice HATHAWAY's opinion is the only opinion that adopts this approach, so this "standard percentage increase calculation" does not, therefore, have support from a majority of this Court.

However, a second approach used by Justice HATHAWAY that I wish to discuss *does* appear to have the support from a majority of this Court—what Justice HATHAWAY

---

[49] *Falcon*, 436 Mich at 454 (opinion by LEVIN, J.).

[50] *Id.* at 454 n 16.

26

calls the "standard percentage decrease calculation."[51] This approach takes the pre- and postmalpractice probabilities of suffering the injury and calculates what proportion of the postmalpractice probability of injury is attributable to the malpractice. The percentage approach is found nowhere in this Court's proximate cause jurisprudence, yet both Justice HATHAWAY's opinion and Justice CAVANAGH's concurring opinion apply it to conclude that plaintiff has made the requisite showing of probable cause to defeat defendant's motion for summary disposition.

As stated, three of the justices who support this approach do so in opposition to their previously stated positions.[52] Moreover, Justice HATHAWAY's opinion and Justice

---

[51] *Ante* at ___ (opinion by HATHAWAY, J.).

[52] Under the hypothetical example Justice CAVANAGH posed in *Stone*, a plaintiff whose risk of suffering a bad result increases from 20 percent to 60 percent is unable to prove causation under the more-probable-than-not standard. This is because the plaintiff's risk has not increased by the more than 50 percentage points traditionally required to prove "but for" causation. Justice CAVANAGH applies a very different approach today, and, under that approach, his hypothetical *Stone* plaintiff *would* be able to prove causation. Whatever innocence Justice CAVANAGH now feigns in treating both that hypothetical case and the instant case as traditional medical malpractice cases, he is unequivocally converting what used to be a lost opportunity case into a traditional medical malpractice case.

A plaintiff who has a preexisting medical condition is *only* able to prove "but for" causation when the alleged malpractice increases the plaintiff's risk of suffering a "bad result" by more than 50 percentage points. Otherwise, there is no way to exclude, as Justice CAVANAGH (and this Court) has previously required, all "other reasonable hypotheses with a fair amount of certainty." *Skinner*, 445 Mich at 166 (quotation marks and citation omitted). The approach adopted by the opinions of Justices HATHAWAY and CAVANAGH negates this basic requirement of proximate cause and would allow a plaintiff to recover for a bad result even in situations in which other, nonmalpractice "causes" for the result predominated in creating it.

CAVANAGH's concurring opinion apply the new standard in an especially troubling fashion. It is a truism in statistical methodology that one marshaling statistical evidence to support causation must apply the principle of *ceteris paribus* by "comparing like with like."[53] The new majority violates this basic principle of statistical analysis to reach its desired result. The expert testimony indicated that plaintiff's chance of suffering a stroke would have been reduced from the range of 10 to 20 percent to the range of 5 to 10 percent if plaintiff had been treated according to the asserted standard of care. In

_____

The new majority's approach would allow a plaintiff to recover *in full* from a doctor who, for example, failed to diagnose cancer at its earliest stages, but still diagnosed it at a stage where it was much more probable than not that a patient would survive. To put figures on this situation, suppose a plaintiff's risk of dying from cancer is 1 percent if it is caught at its earliest stages. A doctor who fails to catch the cancer at that stage, but who catches it and treats it at a stage where the risk of dying from cancer is 3 percent, then, is liable, under the new majority's new approach, for the *entire* injury, should one occur, because the failure to diagnose contributed to 2/3 of the risk of injury. This is true, according to the new majority, even though the doctor only decreased the patient's chance of surviving by 2 percentage points, from 99 percent to 97 percent.

By shifting many lost opportunity claims into traditional medical malpractice claims, the new majority creates additional liability of a defendant for the *entire* injury, not just for the *increased risk* of injury, as lost opportunity claims provide. See *Falcon*, 436 Mich at 471 (opinion by LEVIN, J.) ("In this case, 37.5 percent times the damages recoverable for wrongful death would be an appropriate measure of damages."). This shift in determining a defendant's liability is *essential* to understanding what the new majority is trying to accomplish in this case. Now plaintiffs need only prove that a doctor's negligence contributed to the risk of injury, not that his negligence actually *caused* the injury. And no amount of pretended ignorance about the significance of these changes by members of the new majority alters their fundamental and radical impact on this area of the law.

[53] See Lewis-Beck, Bryman, & Liao, eds, 1 *The SAGE Encyclopedia of Social Science Research Methods* (Thousand Oaks, Cal: SAGE Publications, Inc, 2004), p 117 ("*Ceteris paribus* . . . refers to the process of comparing like with like when asserting a causal relationship or the effect of one variable on another.").

28

clarifying these statistical ranges, the expert concluded that plaintiff's likelihood of suffering a stroke would have been "cut in half" under the standard of care urged by plaintiff. In other words, the upper end of the range of plaintiff's likelihood of suffering a stroke was "cut in half," from 20 percent to 10 percent, and the lower end of that range was *also* "cut in half," from 10 percent to 5 percent. Rather than comparing like with like—the lower end of each range *or* the upper end of each range—a majority of this Court fallaciously compares the lower end of one range (5 percent) with the upper end of the other (20 percent). They do so in order to conclude that the alleged malpractice caused 75 percent of plaintiff's chance of suffering a stroke (15/20).[54] This failure to "compare like with like" is a patent error of statistical analysis, but it gets the majority where it needs to go to support its conclusion that plaintiff has established "but for" cause.

Finally, Justice HATHAWAY's opinion concludes that "plaintiff established a question of fact on the issue of proximate causation because plaintiff's experts opined that defendants' negligence more probably than not was the proximate cause of the plaintiff's injuries."[55] This statement might have had more relevance if it had been

---

[54] The new majority calculates that defendants' alleged malpractice caused an increase in plaintiff's risk of suffering a stroke by 15 percentage points (5 percent risk without malpractice subtracted from 20 percent risk with malpractice). They then divide that figure by plaintiff's 20 percent risk of a stroke with malpractice to conclude that the alleged malpractice caused 75 percent of plaintiff's chance of suffering a stroke. See *ante* at ___ (opinion by HATHAWAY, J.); *ante* at ___ (CAVANAGH, J., concurring).

[55] *Ante* at ___ (opinion by HATHAWAY, J.).

supported by the experts' *actual* statistical evidence of plaintiff's chances of suffering the stroke. However, as discussed above, plaintiff's experts were unable to show proximate causation between the alleged malpractice and plaintiff's stroke. All they were able to show was a *connection* between the alleged malpractice and plaintiff's *increased likelihood of suffering a stroke*, from between 5 to 10 percent to between 10 to 20 percent. Justice HATHAWAY's analysis, such as it is, allows an expert to say certain "magic words" about proximate causation, while presenting statistical evidence to the contrary.

As stated, this case is a prototypical lost opportunity case because plaintiff cannot establish that, more probably than not, defendants proximately caused his stroke because he was predisposed to suffer one, his risk being in the range of 5 to 10 percent, even with medical care that satisfied plaintiff's proposed standard of care. Accordingly, I vigorously dissent from the conclusion of a majority of this Court that plaintiff asserted a traditional medical malpractice claim and would instead conclude that plaintiff asserted a lost opportunity claim.

## C. MCL 600.2912a(2) IS (STILL) UNENFORCEABLE AS ENACTED

Because the new majority concludes that plaintiff's claim is a traditional medical malpractice claim, it does not need to reach the question whether plaintiff's claim meets the requirements of the second sentence of MCL 600.2912a(2), which applies only to lost opportunity claims. The decision of the new majority to treat this case as a traditional medical malpractice claim, of course, obviates the need for interpreting the second sentence of MCL 600.2912a(2) because the new majority essentially treats *all* medical

30

malpractice claims under the weakened *Falcon* causation standard heretofore applicable *only* to lost opportunity claims. Therefore, the decision of the new majority to overrule the Court of Appeals decision in *Fulton*, to the extent *Fulton* drew a line between lost opportunity cases and traditional medical malpractice cases, also does away with *Fulton*'s application of the sentence in § 2912a(2) that applies to lost opportunity cases. *Fulton* only applies to lost opportunity cases. By concluding that the instant case sounds in traditional medical malpractice, the new majority essentially writes the decision in *Fulton* out of existence. Thus, its expansive decision in this case is characteristic of the new majority that overreaches in its decisions in order to achieve its own preferred policy outcomes.[56]

---

[56] Although the "new majority" has only been in existence 18 months, it has an impressive record of overturning cases consistent with the Chief Justice's promise to "undo . . . the damage that the Republican-dominated court has done." *She Said*, Detroit Free Press, December 10, 2008, p 2A.

By my count, the new majority has now overturned this term 12 cases in addition to the one that it overturns today:

1. In *People v Feezel*, 486 Mich 184; 783 NW2d 67 (2010), the new majority overruled *People v Derror*, 475 Mich 316; 715 NW2d 822 (2006).

2. In *McCormick v Carrier*, ___ Mich ___; ___ NW2d ___ (2010), the new majority overruled *Kreiner v Fischer*, 471 Mich 109; 683 NW2d 611 (2004).

In *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, ___ Mich ___; ___ NW2d ___ (2010), the new majority overruled the following cases:

3. *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001);

4. *Crawford v Dep't of Civil Serv*, 466 Mich 250; 645 NW2d 6 (2002);

5. *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608; 684 NW2d 800 (2004);

6. *Associated Builders & Contractors v Dep't of Consumer & Indus Servs Dir*, 472 Mich 117, 124-127; 693 NW2d 374 (2005);

7. *Mich Chiropractic Council v Comm'r of the Office of Fin & Ins Serv*, 475 Mich 363; 716 NW2d 561 (2006);

8. *Rohde v Ann Arbor Pub Sch*, 479 Mich 336; 737 NW2d 158 (2007);

9. *Mich Citizens for Water Conservation v Nestlé Waters North America Inc*, 479 Mich 280, 302-303; 737 NW2d 447 (2007); and

10. *Manuel v Gill*, 481 Mich 637; 753 NW2d 48 (2008).

11. In *Bezeau v Palace Sports Entertainment, Inc*, ___ Mich ___; ___ NW2d ___ (2010), the new majority expressly overruled the limited retroactive effect of *Karaczewski v Farbman Stein & Co*, 478 Mich 28; 732 NW2d 56 (2007).

12. In *Univ of Mich Regents v Titan Ins Co*, ___ Mich ___; ___ NW2d ___ (2010), the new majority overruled *Cameron v Auto Club Ins Ass'n*, 476 Mich 55; 718 NW2d 784 (2006).

Given this list of "lately departed" decisions of the "Republican-dominated Court," killing one Court of Appeals case such as *Fulton*—even if entirely irrelevant to the question the new majority purports to address here—is hardly surprising for the new majority which, before its members *became* the majority, were individually and collectively notably more "hawkish" on preserving precedent. See *Pollard v Suburban Mobility Auth for Regional Transp*, 486 Mich 963, 963-965 (2010) (YOUNG, J., dissenting statement). As in three other cases decided this term, Justice WEAVER repeats her tired and unsuccessful attempt to defend her changing position on stare decisis. *Ante* at ___ (WEAVER, J., concurring). See also *Univ of Mich Regents*, ___ Mich at ___ (WEAVER, J., concurring); *Lansing Sch Ed Ass'n*, ___ Mich at ___ (WEAVER, J., concurring); *McCormick*, ___ Mich at ___ (WEAVER, J., concurring). Her position does not become any more convincing with repetition. My dissenting opinion in *Univ of Mich Regents*, ___ Mich at ___ (YOUNG, J., dissenting), explains in full why Justice WEAVER's position is merely an attempt to justify stark judicial policy-making.

The Legislature added subsection (2) to MCL 600.2912a shortly after the *Falcon* Court created the new claim for loss of an opportunity to survive. The new subsection provides:

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.[57]

As the lead opinion in *Stone* aptly observed, there are multiple problems in determining whether the requirements of MCL 600.2912a(2) apply in any particular case. As stated above, the two sentences are internally inconsistent and, therefore, create a paradox:

> [T]he first sentence of this new subsection codifies and reiterates the common-law requirement that a plaintiff show that the defendant's malpractice more probably than not caused the plaintiff's injury. The second sentence of subsection 2 adds that, in medical-malpractice cases, a "plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%." However, one must keep in mind that the relevant caselaw when subsection 2 was enacted held that the lost-opportunity doctrine applies "*in situations where a plaintiff cannot prove that a defendant's actions were the cause of his injuries . . . .*" *Vitale*, [150 Mich App] at 502 (emphasis added). That is, the first sentence of subsection 2 requires plaintiffs in every medical-malpractice case to show the defendant's malpractice proximately caused the injury while, at the same time, the second sentence refers to cases in which such proof not only is unnecessary, but is impossible.[58]

---

[57] MCL 600.2912a(2).

[58] *Stone*, 482 Mich at 156-157 (opinion by TAYLOR, C.J.).

Even ignoring the internal inconsistency, the second sentence of subsection (2) is incomprehensible as written. Subsequent to the amendment, the split Court of Appeals panel in *Fulton* offered two contradictory interpretations of the second sentence, neither of which was consistent with the text of that sentence as enacted. The *Fulton* majority determined that "MCL 600.2912a(2) requires a plaintiff to show that the loss of the opportunity to survive or achieve a better result exceeds fifty percent."[59] As the lead opinion in *Stone* indicated, this interpretation "improperly adds to the statute the words 'loss of,' effectively replacing the word 'opportunity' where it is used the second time with the phrase 'loss of opportunity.'"[60] Thus, the *Fulton* majority essentially rewrote the second sentence of § 2912a(2) to include the following bracketed words: "In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the [loss of] opportunity was greater than 50%."

The dissenting judge in *Fulton* did not fare any better. His interpretation of MCL 600.2912a(2) required a plaintiff "'to show that, had the defendant not been negligent, there was a greater than fifty percent chance of survival or a better result.'"[61] This

---

[59] *Fulton*, 253 Mich App at 83.

[60] *Stone*, 482 Mich at 159 n 9 (opinion by TAYLOR, C.J.).

[61] *Fulton*, 253 Mich App at 91 (SMOLENSKI, J., dissenting), quoting *Wickens v Oakwood Healthcare System*, 242 Mich App 385, 392; 619 NW2d 7 (2000). The published Court of Appeals decision in *Wickens* was not controlling in *Fulton* because this Court had already reversed in part and vacated in part that published decision. *Wickens v Oakwood Healthcare System*, 465 Mich 53; 631 NW2d 686 (2001).

34

interpretation essentially rewrote the second sentence of § 2912a(2) to include the following bracketed word: "In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the [initial] opportunity was greater than 50%."

Thus, both the majority and the dissent in *Fulton* inserted additional words into the statute. Their reasons for doing so were identical: each believed the additional language was necessary to enforce the perceived legislative intent to respond to the *Falcon* Court's creation of the lost opportunity claim. However, these multiple interpretations show that, even if they were correct that the amendment was a legislative response to *Falcon*, the scope of such response was far from clear.

In the end, the lead opinion in *Stone* concluded:

> It is confounding to attempt to ascertain just what the Legislature was trying to do with this amendment. . . .
>
> As written, the second sentence of MCL 600.2912a(2) can be made understandable only by adding words or by redefining "injury" in a way significantly contrary to the mass of caselaw at the time the sentence was added. . . . None of these multiple, contradictory interpretations can be shown to be the "correct" construction of legislative intent. Choosing between them can only be a guess. . . . Accordingly, I conclude that the second sentence of subsection 2 cannot be judicially enforced because doing so *requires* the Court to impose its own prerogative on an act of the Legislature.[62]

---

[62] *Stone*, 482 Mich at 160-161 (opinion by TAYLOR, C.J.).

Since this Court's split opinions in *Stone*, the Legislature has not clarified the confusion surrounding the appropriate interpretation of MCL 600.2912a(2). Therefore, my position remains that the provision is unenforceable as enacted.

The decision by the new majority that this case represents a traditional medical malpractice case further muddles this important area of the law. Moreover, three justices of the new majority have changed their published positions over the past several years on the nature of the evidence required to prove proximate cause.

**If the numerous fractured decisions and inconsistent opinions of the members of this Court fail to demonstrate that this statute is impossible to interpret reasonably, then it is hard to envision a better illustration that MCL 600.2912a(2) is inherently internally inconsistent and cannot be parsed.**

IV. CONCLUSION

Confusion and uncertainty in the law prevent citizens from arranging their affairs in a predictable fashion. This Court initially created uncertainty in adopting the lost opportunity claim in *Falcon* because it was so profoundly at odds with traditional principles of causation. It is no wonder that the Legislature had difficulty reconciling "*Falcon* causation" with the traditional causation that the Legislature clearly desired to maintain in medical malpractice claims. Today, the new majority has created even more uncertainty in interpreting the legislative response to *Falcon*. While the result in this case undoubtedly serves the interests of lawyers who litigate medical malpractice cases, it poorly serves the people of this state to have the law become even more incomprehensibly muddled. This is not an accidental act, but one intentionally designed

36

to thwart the legislative directive that the plaintiff prove the traditional requirement of proximate cause in *every* "action alleging medical malpractice . . . ."[63] Judges, as neutral arbiters whose function is merely to interpret the laws enacted through the democratic process, should not be agents of "societal change" they desire, and they certainly should not contribute to confusion and chaos in the law. The new majority's resolution of this case fails on both counts.

Plaintiff's claim is a prototypical lost opportunity claim. As such, the second sentence of MCL 600.2912a(2) expressly controls plaintiff's claim. However, I continue to maintain that § 2912a(2) is unenforceable as enacted, and I reiterate former Chief Justice TAYLOR's call for the Legislature "to reexamine its goal and the policies it wishes to promote and strive to better articulate its intent in that regard."[64] Today, that call is more urgent than it was just two years ago.

Today is a sad day for predictability in Michigan law. The disorder sown by the new majority in their several opinions speaks poorly of the quality of decision-making in this Court. Doctrinal destruction aside, the obvious manipulation of the statistical evidence by the justices of the new majority to achieve their goal of creating a cause of action when the proofs have failed is itself worthy of condemnation.

---

[63] MCL 600.2912a(2).

[64] *Stone*, 482 Mich at 165 (opinion by TAYLOR, C.J.).

For all of the reasons stated, I vigorously dissent from overreaching by the new majority and, instead, would vacate as improvidently entered this Court's September 30, 2009, order granting leave to appeal.

C ORRIGAN, J., concurred with Y OUNG, J.